\* THE BANK OF NEW HANOVER v. WILLIAMS, BLACK & Co.

*Bank of New Hanover—Charter—Contract—Equitable Assignment— Factor's Lien—Commercial Usage—Issues of Fact.*

1. The provisions of section 11 of the charter of the bank of New Hanover (Private Laws 1871–'72, ch. 31) do not include *merchants* and can not by implication be extended to them.

2. Under the provisions of such section the *lien* and *advancements* should be cotemporaneous acts ; it was not intended that the bank at any time after making an advancement could take a lien upon all future purchases of the mortgagor for a general balance due on such advancements.

3. On the trial below, it appeared that the plaintiff advanced money to one M for the purchase of certain rosin, with the understanding that M was to draw a draft upon the rosin to pay for the advancement ; M shipped the rosin to the defendants in New York and drew

---

\* FAIRCLOTH, J. did not sit on the hearing of this case.

upon them in favor of plaintiff, sending a bill of lading to defendants with a letter "that he had drawn on them at 30 days for $2947.98 in favor of the cashier of plaintiff bank, *please protect;*" defendants protested the draft for non-acceptance and thereupon plaintiff telegraphed them "we hold registered mortgage on rosin shipped you by M and must follow it if draft is not accepted;" at the time of the shipment there was a balance due defendants from M on account of mutual dealings theretofore of more than the value of the rosin; defendants had no notice of agreement between M and plaintiff that the proceeds of rosin should be applied to the payment of the draft; defendants sold the rosin and applied the proceeds due them from M; *Held,*

(1) That the telegram from plaintiff to defendants was evidence that the plaintiff did not claim that its agreement with M constituted an equitable assignment.

(2). That an agreement to pay a debt out of a particular fund is not an equitable assignment of the fund; and the agreement between M and plaintiff did not vest in the plaintiff any title, legal or equitable, to the rosin when purchased.

(3) That it was properly submitted to the jury as to whether or not the draft and letter constituted an *instruction* to defendants, by commercial usage, to appropriate the proceeds of the rosin to the payment of the draft; and the jury having found in the negative, the plaintiff can not recover.

(4) That it was not error to submit to the jury, an issue, that even if such instruction was given, did the long continued dealings between M and defendants, leaving a balance due them, warrant the defendants by the commercial usage of New York in refusing to accept the draft and in applying the proceeds of the rosin to their own balance.

4. In such case the defendants, not being parties or privies to the agreement between M and plaintiff, were left free to enforce their factor's lien against the proceeds of the rosin consigned to them by M, without liability to plaintiff.

5. Courts, in administering commercial law, have the power and it is proper to submit to a jury as a question of fact, as well what is the meaning of commercial terms, as what was the established commercial usage in respect of a certain course of dealing.

(*Simonton* v. *Lanier,* 71 N. C. 498, cited and approved.)

(READE, J. *Dissenting.*)

BANK OF NEW HANOVER *v.* WILLIAMS.

CIVIL ACTION, tried at Fall Term, 1877, of NEW HAN-OVER Superior Court, before *Moore, J.*

The plaintiff bank was duly chartered by an act of assembly ratified on the 12th of January, 1872, and by a power alleged to have been granted, it took a mortgage on the 6th of April, 1873, from Moffit & Co., merchants in the city of Wilmington, to secure payment of $20,000 advanced to enable them to carry on business. This mortgage was proved and registered on the 9th of July, 1873. On the 9th and 10th of September, 1873, Moffit arranged with plaintiff to raise money on a shipment of 1,003 barrels of rosin. At this time the balance due on the original advancement exceeded the amount in controversy in this action. He obtained the money with the understanding that he was to draw a draft on the rosin to pay for the advancement, and shipped said rosin on said 10th of September to defendants, commission merchants in New York, in the usual course of trade with a bill of lading, and a letter stating "that he had drawn on defendants at 30 days for $2,947.98, in favor of the cashier of plaintiff bank, please protect," and signed by Moffit & Co., who informed the plaintiff thereof. The draft was for the invoice value of said rosin. Moffit commenced shipping cotton and naval stores to defendants in 1872, and so continued until the time of the above transaction, when defendants protested the said draft for non-acceptance, and thereupon the plaintiff telegraphed to defendants,—"we hold registered mortgage on rosin shipped you by Moffit, and must follow it if draft is not accepted," which was the first information defendants had of plaintiffs' claim to the rosin in their possession, it having been delivered to them by virtue of said bill of lading. At the time of said shipment, the balance due the defendants from Moffit on account of mutual dealings as aforesaid was about $3,000. The rosin was sold by defendants in the usual way, and the amount realized ($2541,96)

was placed to the credit of Moffit & Co., leaving an unpaid balance still due the defendants.

On the 13th of September, 1873, Moffit & Co. failed in business, and have since been largely insolvent. The defendants did not know of said failure when they refused to accept said draft, and it was admitted that they had no notice of the agreement between the plaintiff and Moffit, that the proceeds of the sale of said rosin should be applied to the payment of said draft. The plaintiff, however, contended that the words "please protect" in said letter was a commercial phrase to which, taken in connection with the letter, the usage among merchants had attached a technical and well known meaning, to-wit, an instruction to defendants to apply proceeds of that shipment to payment of that draft; and evidence was adduced to show the same, which was replied to by the defendants, who insisted that in this case they had a right to appropriate said proceeds, by the custom of merchants, to the payment of their own balance. There was much evidence upon this point. The plaintiff claimed the right to recover the amount of sales of the rosin by virtue of said mortgage, and also by virtue of an equitable assignment of the proceeds thereof by Moffit to the plaintiff.

The issues submitted to the jury, which are material, were as follows:—

1. Did Moffit & Co. consign to defendants on the 10th day of September, 1873, 1,003 barrels of rosin of the invoice value of $2947,98, with instructions to appropriate and apply the proceeds thereof to the payment of a draft of same date and like amount, payable to the order of S. D. Wallace, cashier of plaintiff, thirty days after date? Ans.—No.

2. If such instructions were given, and there had been a long series of shipments and drafts, in the course of which Moffit & Co., became indebted to defendants, was there any

general commercial usage in New York by which defendants were entitled to refuse the draft, and apply the proceeds of this shipment to their own balance? Ans.—Yes.

His Honor thereupon rendered judgment for the defendants, and the plaintiff appealed.

*Messrs. C. M. Steadman* and *W. S. & D. J. Devane,* for plaintiff.

*Messrs. A. T. & J. London,* for defendants.

BYNUM, J. This is an action by the plaintiff to recover from the defendants the sum of $2541.98, the proceeds of the sale of 1,003 barrels of rosin, sold by them. The plaintiff corporation bases its right of recovery upon two alternative propositions; first, that it had acquired the legal title to the rosin under a mortgage executed by Moffit & Co., to the plaintiff, bearing date the 6th of May, 1873; and second, under an equitable assignment of the proceeds of the sale of the rosin alleged to have been made to the plaintiff by Moffit & Co., on the 10th of September, 1873.

We will first dispose of the claim under the mortgage. By § 11 of the charter of the plaintiff corporation, it is provided: "That to aid planters, miners, manufacturers and others, the said bank shall and may have power to advance or loan to any planter, farmer, miner, manufacturer or other person or persons, any sum or sums of money, and to secure the repayment of the same, taking in writing a lien or liens on the crop or crops to be raised, even before planting the same, or upon the present or prospective products of any mining operation, or upon any article or articles then existing or thereafter to be made, purchased, manufactured, or otherwise acquired, and any lien so taken shall be good and effectual in law," &c.

The mortgage under which the plaintiff claims was executed the 6th of May, 1873, and registered the 9th of July, 1873, and the rosin claimed under it in this action was pur-

chased by Moffit & Co., the mortgagors on the 10th of September, 1873, thereafter, and by Moffit & Co. was on the same day consigned to the defendants, commission merchants in New York, for sale. Moffit, the mortgagor, was neither a planter, miner nor manufacturer, but was a merchant only. The act therefore does not expressly embrace a merchant, and it is by construction only that he can be included in this section of the charter.

We by no means decide that any of the classes expressly named, can execute a mortgage of property, indefinitely thereafter to be acquired, which shall be valid as to third persons. Such a provision in the charter is so obviously an "exclusive privilege" within the meaning of the constitution, and so opposed to common right and the general law of the land, and if it could be enforced by law, would be such an *incubus* upon that freedom of commerce which it is the policy of this State and country to foster and encourage, that this Court would long hesitate before affirming its validity. *Simonton* v. *Lanier,* 71 N. C., 498. We waive that discussion and confine ourselves to the construction of the section.

1. The language of the section does not embrace merchants, and we can not by implication extend it to them. They are a class distinct from the producing class. Merchants are not producers, and it was the manifest purpose, at the time this charter was granted by the legislature, to benefit that class. The persons expressly described are planters, miners and manufacturers, who are producers. If it were necessary to give effect to the words "others" and "other persons" to make complete sense, as is contended by the plaintiff, those words might be extended so as to embrace persons occupied in the fisheries, for instance, as an important producing class. This would satisfy the letter without violating the spirit and purpose of the act, by giving it the universal and dangerous application contended for.

2. The section of the charter we are considering provides that to aid planters, &c., "advancements may be made," &c., "taking liens," &c., plainly contemplating that the "lien" and the "advancements"—the one in consideration of the other—should be contemporaneous acts. It was never intended under this section that the bank could at any subsequent period of time after the advancements had been made, take a lien upon all future purchases for a general balance on such advancements. The mortgage under consideration was made by Moffit & Co. to the plaintiff, not to secure advances then to be made or thereafter—like the mechanics' or farmers' lien—but it was made to secure a general balance of an indefinite past indebtedness. This is an improper construction of this section of the charter, when under this mortgage a legal title is set up to property purchased in the usual course of mercantile trade subsequent to the execution of the mortgage. The mortgage nevertheless is not invalid, for under the first section of the charter, the bank is endowed with "capacity to take, hold and convey real and personal property and with all the powers, rights, and privileges granted to any bank by that or any preceding legislation," &c. Under this provision it was competent for the bank to take this, or other mortgages to secure a present or past indebtedness. But it can not be contended that such a mortgage expressly securing a past debt of $20,000 and that only, can be extended so as to vest in the mortgagee the legal title to 1,003 barrels of rosin, purchased by Moffitt & Co., four months after the execution of the mortgage. Unless it can have this effect (and it certainly can not) for the purpose of this action the mortgage must be put out of the way.

Failing to recover upon the mortgage the plaintiff falls back upon the claim of an equitable assignment by Moffitt & Co. of the anticipated proceeds of the sale of the rosin. To this new cause of action the defendants make a prelimi-

nary objection, that to constitute an equitable assignment the intent and agreement to make the transaction such, must appear, and that such intent and agreement, not only do not appear but are here rebutted; because when the plaintiff received notice on the 22d of September that the defendants had protested the draft of Moffitt & Co., payable to S. D. Wallace, cashier, it dispatched to the defendants a telegram in these words: "We hold *registered mortgage* on the rosin shipped you by Moffitt, and must follow it if draft is not accepted." From this telegram it appears that the plaintiff did not then claim or rely upon the agreement and promise of Moffitt & Co. as constituting an equitable assignment or other contract which could be enforced, but on the contrary relied solely upon its rights as derived from and under the mortgage. This is a strong view of this part of the case, for if the parties themselves intended to make no such contract as is now insisted on, the law will not step in and make one to the prejudice of intervening rights of persons dealing with the property in the usual course of trade.

The exact transaction between the plaintiff and Moffitt & Co. as found by the jury was this: "That the said draft was discounted by the plaintiff and the money advanced for the purchase of said 1,003 barrels of rosin, at the request of Moffit & Co., upon the understanding and agreement that the proceeds of the sale of said rosin so purchased should be applied to the payment of said draft for $2,947.98." This contract did not vest in the plaintiff any title in the rosin when purchased, either legal or equitable.

An agreement to pay a debt out of a particular fund is not an equitable assignment of that fund. The distinction is between promise and performance; a promise is something to be done, an assignment is something done and finished, leaving nothing more in the assignor to do, to complete the right. For the breach of promise the aggrieved party must proceed against the promisor for damages or

specific performance, while upon the assignment he may proceed for the fund itself against the party in possession. 3 Lead. Cases in Eq. notes to *Row* v. *Dawson*, 230; *Trist* v. *Child*, 21 Wall. 447; *Christmas* v. *Russell*, 14 Wall. 84.

The plaintiff, however, does not so much rely upon this particular agreement between it and Moffit & Co. to have constituted an equitable assignment of the fund, as upon the subsequent draft and letter, construed together, amounting to such an assignment. If the draft and letter constituted an *instruction* that the proceeds of the sale of the rosin should be applied to the payment of the draft, we might concede for the purposes of this case that such an instruction was an equitable assignment, and that the defendants could not receive the consignment without incurring the obligation to pay the draft, the one thing being the compliment of the other. This proposition was the plaintiff's chosen battle ground, and without at all admitting that the affirmative of it would establish the plaintiff's right to recover, the defendants joined issue upon it. It became material, therefore, to ascertain the commercial construction of the terms employed in the letter and draft, by commercial men in the course of their business, as constituting or not constituting the "instruction" contended for by the plaintiff.

It was admitted that the meaning and effect of these instruments were to be arrived at by the commercial usage. The question was submitted to a jury in the first issue, and upon the evidence of merchants it was found by verdict that by the custom of merchants such a draft and letter do not constitute an instruction to appropriate and apply the proceeds of the sale of the rosin to the payment of the draft. This finding of the jury would seem to be decisive of the case, for if no appropriation of the proceeds of the sale had been made by Moffit & Co., and regarding the equities of the parties as equal, the one who acquires the possession or legal title will not be compelled to yield it until his claim

is satisfied. This would be so apart from the rights of the defendants as the factors of Moffit & Co. But it was farther insisted by the defendants that even if the consignment of the rosin had been accompanied by the instruction, as contended for by the plaintiff, yet if there had been a long series of shipments and drafts, in the course of which Moffit & Co. became indebted to the defendants, then by the general commercial usage in New York the defendants were entitled to refuse the draft and apply the proceeds of the shipment to their own balance.

This question of a general commercial usage, though objected to by the plaintiff, was also submitted to the jury as one of fact, and it was found by their verdict upon the second issue that such was the custom of merchants in New York. This issue and finding do not seem to us to be material, after the jury upon the first issue had found that by the law merchant, the shipment had been made to the defendants without instruction as to the application of the proceeds of sale; for in the absence of such instruction a factor has the undoubted right to apply such proceeds of sale to the payment of a general balance due from his customer. So that the jury by their verdict upon the second issue in connection with their finding upon the first, only declared what the law was without such finding. Such an issue and verdict can not be assigned for error. "Factors and brokers to whom goods are consigned to be sold," says Addison, "have a lien for the general balance due to them from their employers or principals in the ordinary course of their business as factors, and for their acceptances on behalf of such employers, upon the goods whilst in their possession and on the moneys realized by the sale of them. This right exists universally by the custom of the trade. It is part of the law merchant, and as such is judicially taken notice of by the Courts, no proof ever being required as a

matter of fact that such general lien exists." 2 Add. on Cont., § 932.

To such an extent are the rights of lien of the factor protected by the law merchant that even where he has made advances on the credit of a deposit, not knowing the depositor to be an agent, he can retain for a general balance due by such agent, against the true owner; and the same rule applies to insurance brokers, 2 Add., § 933, and note. The rights of the factor are well illustrated in the late case of *Exchange Bank of St. Louis* v. *Rice,* 107 Mass., 37, which is directly in point. There, a merchant consigned twelve bales of cotton to a factor and on the same day drew a bill of exchange upon him expressed on its face to be drawn " against twelve bales of cotton," procured its discount by a bank, and advised the factor of the consignment and the draft. Upon presentment of the draft the factor refused to accept it and advised the merchant by letter that he did so because he had not received the bill of lading, and that he would accept when the bill was received. Two days later he received the bill, and a few days afterwards the bank to which his letter in the meantime had been shown, again presented the draft to him together with his letter and a duplicate bill of lading, and requested his acceptance, which he again refused. Upon the subsequent receipt of the cotton, the factor sold it and credited its proceeds to the merchant, who was his debtor to a large amount. It was there contended, as it has been here, that the plaintiff had an equitable lien upon the cotton to the extent of the draft discounted by the bank, that it had bought the draft with the memorandum (" against twelve bales of cotton ") upon it and in reliance upon the cotton as security for its payment; that under these circumstances the defendant could not accept the consignment without accepting the draft. But the Court decided otherwise, and held that the plaintiff had acquired no title to the cotton against which the draft

was drawn ; that the bill of lading was not attached to the draft or made payable to the holder thereof, or delivered to the plaintiff. The cotton was not of sufficient value to pay the draft, and the balance of account between the defendant and drawer was largely in favor of the defendant. There was no ground, therefore, for implying a promise from the defendant to the plaintiff to pay either the amount of the draft or the proceeds of the cotton.

"The plaintiff," said the Court, " did not take the draft or make advances upon the faith of any promise of the defendant or of any actual receipt by him of the cotton or the bill of lading, but solely upon the faith of the drawer's signature, and implied promise that the defendant should have funds to meet the draft. The whole consideration for the defendant's promise moved from the drawer and not from the plaintiff. And the defendant made no promise to the plaintiff." See also *Tiernan* v. *Jackson*, 5 Pet. 580 ; 1 Sandf. 416 ; 1 Seld. 525 ; 3 B. & Ald. 643 ; 3 Sand. 258 ; 18 Wend. 319.

So that whatever may be the rights and the remedies of the plaintiff and Moffit & Co. between themselves, and arising out of their contracts and promises, the one with and to the other, the defendants, who were not parties or privies thereto, and made no promise to the plaintiff, have not made themselves liable for the claim of the plaintiff, but are left free to enforce their factor's lien against the proceeds of the rosin consigned to them by their debtor, and in execution of the contract with Moffit & Co., upon the faith of which the advancement was made. *Robey & Co.* v. *Ollier L. R.,* 7 Ch. App., 695, (3 Moak, 571).

We are aware that there are *dicta* in some of the elementary writers upon this subject, that when one writes to his factor that he has sent him certain goods for sale, and drawn of him to a certain amount, the factor if he receives the con-

signment would be bound to accept the bill. 1 Pars. Bills and Notes 291 ; 2 Story Eq. Jur. § 1045.

But it will be found on examination that the authorities they cite do not support them, or are explained away or overruled by subsequent decisions, and that the law is correctly stated in *Exchange Bank* v. *Rice*, 107 Mass. 37. See also 1 How. 239; *Sweeny* v. *Easter*, 1 Wall. 166 ; 1 Smith L. C. 635, 417 ; 5 Sandf. 267; 1 Sugden on V. & P. 381.

If the finding of the jury upon the second issue had not become immaterial by the finding upon the first, it would seem to be settled by the highest authority that the Courts in administering the commercial law have the power, and it is proper to submit to the jury as a question of fact, as well what is the meaning of commercial terms, as what was the established commercial usage in respect of a certain course of dealing ; as for instance, the meaning of the words " please protect," and whether factors can refuse to accept a draft in a case like the present and apply the proceeds of sale in payment of a general balance.

Merchants dealing in a particular kind of merchandise, and bankers discounting bills of persons in particular trades are presumed to know, and make their contracts in reference to the custom of the trade. In *Ex Parte Watkins* L. R, 8 Ch. App. (6 Moak's Eng. Rep. 466) SIR G. MELLISH L. J. said : "I must also say I think it extremely desirable that as far as can be done consistently with the rules of law, the law should be so interpreted as to be in accordance with the customs of trade. To make the law needlessly conflict with the customs of any trade causes the greatest inconveniences and injustice to persons in that trade." Also *Ashforth* v. *Redford*, L. R. 9 C. P. 20 (7 Moak's Eng. Rep. 135.)

In conclusion, the plaintiff here had a well known and usual means of protection which he refused or neglected to take, to wit, either to take the bill of lading deliverable to its own order, or to attach the bill of lading to the draft, not

to be delivered to the drawee until he accepted the draft; and it was in evidence that such was the custom where the drawer was weak. The plaintiff well knew that Moffit & Co. were weak, for it had a mortgage upon all they had then, or should ever thereafter acquire by the terms of it. The plaintiff at the date of the draft knew that the firm of Moffit & Co. were insolvent and it is evident put a mistaken reliance upon the effect of the mortgage, or upon the personal promise of the firm.

No error.

PER CURIAM.            Judgment affirmed.