## TRIST *v.* CHILD.

1. A mere personal agreement by one setting up a claim on the government, with another person to pay to such person a percentage of whatever sum Congress, through the instrumentality of such person, may appropriate in payment of the claim, does not constitute any lien on the fund to be appropriated; there being no order on the government to pay the percentage out of the fund so appropriated, nor any assignment to the party of such percentage.

2. If such agreement amounted to such an order or assignment as in the case of a debt due by an ordinary person would constitute a lien on the fund, the agreement, in the case of a claim on the government, would, under the act of February 26th, 1853, not do so; for that act declares that all transfers of any part of any claim against the United States, "or of any interest therein, whether absolute or conditional, shall be absolutely null and void, unless executed in the presence of at least two attesting witnesses after the allowance of such claim, the ascertainment of the amount due, and the issuing of a warrant therefor."

3. A contract to take charge of a claim before Congress, and prosecute it as an agent and attorney for the claimant (the same amounting to a contract to procure by "lobby services"—that is to say, by personal solicitation by the agent, and others supposed to have personal influence in any way with members of Congress—the passage of a bill providing for the payment of the claim), is void.

4. Such a contract is distinguishable from one for purely professional services, within which category are included, drafting a petition which sets forth the claim, attending to the taking of testimony, collecting facts, preparing arguments, and submitting them either orally or in writing to a committee or other proper authority, with other services of like character intended to reach only the understanding of the persons sought to be influenced.

5. Though compensation can be recovered for these when they stand by themselves, yet when they are blended and confused with those which are forbidden, the whole is a unit and indivisible, and that which is bad destroys the good. Compensation can be recovered for no part.

APPEAL from the Supreme Court of the District of Columbia; the case being thus:

N. P. Trist having a claim against the United States for his services, rendered in 1848, touching the treaty of Guadelupe Hidalgo—a claim which the government had not recognized—resolved, in 1866-7 to submit it to Congress and to ask payment of it. And he made an agreement with

Linus Child, of Boston, that Child should take charge of
the claim and prosecute it before Congress as his agent and
attorney.   As a compensation for his services it was agreed
that Child should receive 25 per-cent. of whatever sum Con-
gress might allow in payment of the claim.   If nothing was
allowed, Child was to receive nothing.   His compensation
depended wholly upon the contingency of success.   Child
prepared a petition and presented the claim to Congress.
Before final action was taken upon it by that body Child
died.   His son and personal representative, L. M. Child,
who was his partner when the agreement between him and
Trist was entered into, and down to the time of his death,
continued the prosecution of the claim.   By an act of the
20th of April, 1871, Congress appropriated the sum of
$14,559 to pay it.   The son thereupon applied to Trist for
payment of the 25 per cent. stipulated for in the agreement
between Trist and his father.   Trist declined to pay.   Here-
upon Child applied to the Treasury Department to suspend
the payment of the money to Trist.   Payment was sus-
pended accordingly, and the money was still in the treasury.

Child, the son, now filed his bill against Trist, praying
that Trist might be enjoined from withdrawing the $14,559
from the treasury until he had complied with his agreement
about the compensation, and that a decree might pass com-
manding him to pay to the complainant $5000, and for gen-
eral relief.

The defendant answered the bill, asserting, with other de-
fences going to the merits, that all the services as set forth
in their bill were " of such a nature as to give no cause of
action in any court either of common law or equity."

The case was heard upon the pleadings and much evi-
dence.   A part of the evidence consisted of correspondence
between the parties.   It tended to prove that the Childs,
father and son, had been to see various members of Con-
gress, soliciting their influence in behalf of a bill introduced
for the benefit of Mr. Trist, and in several instances obtain-
ing a promise of it.   There was no attempt to prove that
any kind of bribe had been offered or ever contemplated;

but the following letter, one in the correspondence put in evidence, was referred to as showing the effects of contracts such as the one in this case:

FROM CHILD, JR., TO TRIST.

HOUSE OF REPRESENTATIVES,<br>WASHINGTON, D. C., Feb. 20th, 1871.

MR. TRIST: Everything looks very favorable. I found that my father has spoken to C—— and B——, and other members of the House. Mr. B—— says he will try hard to get it before the House. He has two more chances, or rather "morning hours," before Congress adjourns. A—— will go in for it. D—— promises to go for it. I have sent your letter and report to Mr. W——, of Pennsylvania. It may not be reached till next week. Please write to your friends to write immediately to any member of Congress. Every vote tells; and a simple request to a member may secure his vote, he not caring anything about it. Set every man you know at work, even if he knows a page, for a page often gets a vote. The most I fear is indifference.

Yours, &c.,<br>L. M. CHILD.

The court below decreed,

1st. That Trist should pay to the complainant $3639, with interest from April 20th, 1871.

2d. That until he did so, he should be enjoined from receiving at the treasury "*any* of the moneys appropriated to him" by the above act of Congress, of April 20th, 1871.

From this decree the case was brought here.

The good character of the Messrs. Child, father and son, was not denied.

*Messrs. Durant and Horner, for the appellants*, upon the main point of the case (the validity of the contract between Child and Trist), relied upon *Marshall* v. *Baltimore Railroad*,* in this court, and upon the principles there enunciated in behalf of the court by Grier, J.

---

* 16 Howard, 314. They relied also on Tool Company *v.* Norris, 2 Wallace, 54.

*Messrs. B. F. Butler and R. D. Mussey, contra:*

The case relied on by opposing counsel is widely different from this one.

There, Marshall entered—as the report of the case shows—into a contract with the Baltimore and Ohio Railroad Company, to obtain certain favorable legislation in Virginia for the contingent compensation of *fifty thousand dollars* by the use of personal, secret, and sinister influences upon the legislators. He expressly stated that his plan required "absolute secrecy," and "that he could allege 'an ostensible reason' for his presence in Richmond and his active interference without disclosing his real character and object." He spoke of using "outdoor influence" to affect the legislators through their "kind and social dispositions," and pictured them as "careless and good-natured," "engaged in idle pleasures," capable of being "moulded like wax" by the most "pressing influences." The company authorized him to use these means. The question in that case, therefore, was, whether a contract for contingent compensation for obtaining legislation by the use of secret, sinister and personal influences upon legislators was or was not contrary to the policy of the law. And the decision of that question was the decision of the case.

In Marshall's case, the plaintiff and defendant combined together to perpetrate a fraud upon the servants of the public engaged in legislating for the public good, and it was this fact which made the contract infamous and disgraceful and incapable of enforcement in the courts; not that the action sought was that of a legislature.

The case at bar differs from that of Marshall, *toto cœlo.* Here both father and son were openly and avowedly attorneys for their client, Trist. They never presented themselves to anybody in any different or other respect. Every act of theirs was open, fair, and honorable.

Will it be denied that any man having a claim on the government, may appear in person before a committee of Congress, if they allow him, or speak to members of Congress, if they incline to hear him; point out to them the jus-

tice of his claim, and put before them any and all honorable considerations which may make them see that the case ought to be decided in his favor? This, we assume, will not be denied. But suppose that he is an old man, or a man infirm and sick; one, withal, living away from the seat of government; a case, it may be stated, in passing, the exact case of Mr. Trist; for he was old, infirm, sick, and lived at Alexandria. Now, if Mr. Trist being well had the right to call upon committees or members of Congress, and (if they invited him or were willing to listen to him) to show to them that *he* negotiated, as he asserted that he did, the treaty of Guadalupe Hidalgo, and should be paid for doing so, what principle of either morals or policy, public or private, was there to prevent him (being thus old, infirm, sick, and away from Washington) from employing an honorable member of the Massachusetts bar to do the same thing for him? What principle to prevent him from doing by attorney that which he had himself the right, but from the visitation of God, had not himself, and at that time, the physical ability to do?

We are not here asking the court to open the door to corrupt influences upon Congress, or to give aid to that which is popularly known as "lobbying," and is properly denounced as dishonorable. But we are asking that by giving the sanction of the law to an open and honorable advocacy by counsel of private rights before legislative bodies, the court shall aid in doing away with the employment of agencies which work secretly and dishonorably.

The records of Congress show that with honorable motives and dishonorable stimulants both combined and acting upon the two classes of persons—upright and avowed, the Childs; or dishonest and secret, the Marshalls—who urge claims upon Congress, out of fifteen thousand private claims put before it since the government was organized, not more than one-half have been acted upon in any way. Are all private claims—claims in which the public has no interest—to be left absolutely to the action of Congress itself, moving only *suâ sponte?* If so, they will never be

acted upon. They can come before the body only through the action of private parties.

There will, therefore, always be solicitation before legislatures so long as legislatures have the power and exercise it of passing private laws. For the gift, or the art, of statement and persuasion is not the common property of mankind.

And if solicitation of some sort there must be, shall it come from the mouths of such men as Linus Child and his son—lawyers both, of unquestioned integrity—and be an open and upright solicitation of the intellect and the reason of the legislator; or shall it be made, by outlawry, a secret, sinister and personal solicitation of his passions, his prejudices, and his vices?

If you shall decide that the pledged word of his client as to compensation avails the Congressional practitioner nothing; that a man who in his poverty makes a contract may repudiate it when the fruit of the contract is attained; then will you remit all work before such bodies to men devoid of honor, irresponsible both in character and property; preying alike upon the misfortunes of claimants and the weaknesses of legislators.

[A good deal was said in the argument on both sides about contingent fees, but in view of the grounds on which the court based its judgment, a report of that part of the argument would be of no pertinence.]

Mr. Justice SWAYNE delivered the opinion of the court.

The court below decreed to the appellee the amount of his claim, and enjoined Trist from receiving from the treasury "any of the money appropriated to him" by Congress, until he should have paid the demand of the appellee.

This decree, as regards that portion of the fund not claimed by the appellee, is an anomaly. Why the claim should affect that part of the fund to which it had no relation, is not easy to be imagined. This feature of the decree was doubtless the result of oversight and inadvertence. The bill proceeds

upon the grounds of the validity of the original contract, and a consequent lien in favor of the complainant upon the fund appropriated. We shall examine the latter ground first. Was there, in any view of the case, a lien?

It is well settled that an order to pay a debt out of a particular fund belonging to the debtor gives to the creditor a specific equitable lien upon the fund, and binds it in the hands of the drawee.* A part of the particular fund may be assigned by an order, and the payee may enforce payment of the amount against the drawee.† But a mere agreement to pay out of such fund is not sufficient. Something more is necessary. There must be an appropriation of the fund *pro tanto*, either by giving an order or by transferring it otherwise in such a manner that the holder is authorized to pay the amount directly to the creditor without the further intervention of the debtor.‡

Viewing the subject in the light of these authorities, we are brought to the conclusion that the appellee had no lien upon the fund here in question. The understanding between the elder Child and Trist was a personal agreement. It could in nowise produce the effect insisted upon. For a breach of the agreement, the remedy was at law, not in equity, and the defendant had a constitutional right to a trial by jury.§ If there was no lien, there was no jurisdiction in equity.

There is another consideration fatally adverse to the claim of a lien. The first section of the act of Congress of February 26th, 1853, declares that all transfers of any part of any claim against the United States, "or of any interest therein, whether absolute or conditional, shall be absolutely null and void, unless executed in the presence of at least two attesting witnesses after the allowance of such claim,

---

* Yeates v. Groves, 1 Vesey, Jr. 280; Lett v. Morris, 4 Simons, 607; Bradley v. Root, 5 Paige, 632; 2 Story's Equity, ₴ 1047.

† Field v. The Mayor, 2 Selden, 179.

‡ Wright v. Ellison, 1 Wallace, 16; Hoyt v. Story, 3 Barbour's Supreme Court, 264; Malcolm v. Scott, 3 Hare, 39; Rogers v. Hosack, 18 Wendell, 319.

₴ Wright v. Ellison, 1 Wallace, 16.

the ascertainment of the amount due, and the issuing of a warrant therefor." That the claim set up in the bill to a specific part of the money appropriated is within this statute is too clear to admit of doubt. It would be a waste of time to discuss the subject.

But there is an objection of still greater gravity to the appellee's case.

Was the contract a valid one? It was, on the part of Child, to procure by lobby service, if possible, the passage of a bill providing for the payment of the claim. The aid asked by the younger Child of Trist, which indicated what he considered needful, and doubtless proposed to do and did do himself, is thus vividly pictured in his letter to Trist of. the 20th February, 1871. After giving the names of several members of Congress, from whom he had received favorable assurances, he proceeds: "Please write to your friends to write to any member of Congress. Every vote tells, and a simple request may secure a vote, he not caring anything about it. Set every man you know at work. Even if he knows a page, for a page often gets a vote."

In the Roman law it was declared that "a promise made to effect a base purpose, as to commit homicide or sacrilege, is not binding."[*] In our jurisprudence a contract may be illegal and void because it is contrary to a constitution or statute, or inconsistent with sound policy and good morals. Lord Mansfield said:[†] "Many contracts which are not against morality, are still void as being against the maxims of sound policy."

It is a rule of the common law of universal application, that where a contract express or implied is tainted with either of the vices last named, as to the consideration or the thing to be done, no alleged right founded upon it can be enforced in a court of justice.

Before considering the contract here in question, it may be well, by way of illustration, to advert to some of the

---

[*] Institutes of Justinian, lib. 3, tit. 19, par. 24.
[†] Jones *v.* Randall, 1 Cowper, 39.

cases presenting the subject in other phases, in which the principle has been adversely applied.

Within the condemned category are:

An agreement—to pay for supporting for election a candidate for sheriff;* to pay for resigning a public position to make room for another;† to pay for not bidding at a sheriff's sale of real property;‡ to pay for not bidding for articles to be sold by the government at auction;§ to pay for not bidding for a contract to carry the mail on a specified route;‖ to pay a person for his aid and influence in procuring an office, and for not being a candidate himself;¶ to pay for procuring a contract from the government;** to pay for procuring signatures to a petition to the governor for a pardon;†† to sell land to a particular person when the surrogate's order to sell should have been obtained;‡‡ to pay for suppressing evidence and compounding a felony;§§ to convey and assign a part of what should come from an ancestor by descent, devise, or distribution;‖‖ to pay for promoting a marriage;¶¶ to influence the disposition of property by will in a particular way.***

The question now before us has been decided in four American cases. They were all ably considered, and in all of them the contract was held to be against public policy,

---

* Swayze *v.* Hull, 3 Halsted, 54.

† Eddy *v.* Capron, 4 Rhode Island, 395; Parsons *v.* Thompson, 1 H. Blackstone, 322.

‡ Jones *v.* Caswell, 3 Johnson's Cases, 29.

§ Doolin *v.* Ward, 6 Johnson, 194.   ‖ Gulick *v.* Bailey, 5 Halstead, 87

¶ Gray *v.* Hook, 4 Comstock, 449.

** Tool Company *v.* Norris, 2 Wallace, 45.

†† Hatzfield *v.* Gulden, 7 Watts, 152.

‡‡ Overseers of Bridgewater *v.* Overseers of Brookfield, 3 Cowen, 299.

§§ Collins *v.* Blantern, 2 Wilson, 347.

‖‖ Boynton *v.* Hubbard, 7 Massachusetts, 112.

¶¶ Scribblehill *v.* Brett, 4 Brown's Parliamentary Cases, 144; Arundel *v.* Trevillian, 1 Chancery Reports, 47.

*** Debenham *v.* Ox, 1 Vesey, 276; see also Addison on Contracts, 91; 1 Story's Equity, ch. 7; Collins *v.* Blantern, 1 Smith's Leading Cases, 676, American note.

and void.* We entertain no doubt that in such cases, as
under all other circumstances, an agreement express or im-
plied for purely professional services is valid. Within this
category are included, drafting the petition to set forth the
claim, attending to the taking of testimony, collecting facts,
preparing arguments, and submitting them orally or in
writing, to a committee or other proper authority, and other
services of like character. All these things are intended to
reach only the reason of those sought to be influenced.
They rest on the same principle of ethics as professional
services rendered in a court of justice, and are no more ex-
ceptionable. But such services are separated by a broad
line of demarcation from personal solicitation, and the other
means and appliances which the correspondence shows were
resorted to in this case. There is no reason to believe that
they involved anything corrupt or different from what is
usually practiced by all paid lobbyists in the prosecution of
their business.

The foundation of a republic is the virtue of its citizens.
They are at once sovereigns and subjects. As the founda-
tion is undermined, the structure is weakened. When it is
destroyed, the fabric must fall. Such is the voice of uni-
versal history.† The theory of our government is, that all
public stations are trusts, and that those clothed with them
are to be animated in the discharge of their duties solely by
considerations of right, justice, and the public good. They
are never to descend to a lower plane. But there is a cor-
relative duty resting upon the citizen. In his intercourse
with those in authority, whether executive or legislative,
touching the performance of their functions, he is bound to
exhibit truth, frankness, and integrity. Any departure from
the line of rectitude in such cases, is not only bad in morals,
but involves a public wrong. No people can have any higher
public interest, except the preservation of their liberties,

---

* Clippinger v. Hepbaugh, 5 Watts & Sergeant, 315; Harris v. Roof's Ex-
ecutor, 10 Barbour's Supreme Court, 489; Rose & Hawley v. Truax, 21 Id.
361; Marshall v. Baltimore and Ohio Railroad Company, 16 Howard, 314.

† 1 Montesquieu, Spirit of Laws, 17.

than integrity in the administration of their government in all its departments.

The agreement in the present case was for the sale of the influence and exertions of the lobby agent to bring about the passage of a law for the payment of a private claim, without reference to its merits, by means which, if not corrupt, were illegitimate, and considered in connection with the pecuniary interest of the agent at stake, contrary to the plainest principles of public policy. No one has a right, in such circumstances, to put himself in a position of temptation to do what is regarded as so pernicious in its character. The law forbids the inchoate step, and puts the seal of its reprobation upon the undertaking.

If any of the great corporations of the country were to hire adventurers who make market of themselves in this way, to procure the passage of a general law with a view to the promotion of their private interests, the moral sense of every right-minded man would instinctively denounce the employer and employed as steeped in corruption, and the employment as infamous.

If the instances were numerous, open, and tolerated, they would be regarded as measuring the decay of the public morals and the degeneracy of the times. No prophetic spirit would be needed to foretell the consequences near at hand. The same thing in lesser legislation, if not so prolific of alarming evils, is not less vicious in itself, nor less to be condemned. The vital principle of both is the same. The evils of the latter are of sufficient magnitude to invite the most serious consideration. The prohibition of the law rests upon a solid foundation. A private bill is apt to attract little attention. It involves no great public interest, and usually fails to excite much discussion. Not unfrequently the facts are whispered to those whose duty it is to investigate, vouched for by them, and the passage of the measure is thus secured. If the agent is truthful, and conceals nothing, all is well. If he uses nefarious means with success, the spring-head and the stream of legislation are polluted. To legalize the traffic of such service, would open

a door at which fraud and falsehood would not fail to enter and make themselves felt at every accessible point. It would invite their presence and offer them a premium. If the tempted agent be corrupt himself, and disposed to corrupt others, the transition requires but a single step. He has the means in his hands, with every facility and a strong incentive to use them. The widespread suspicion which prevails, and charges openly made and hardly denied, lead to the conclusion that such events are not of rare occurrence. Where the avarice of the agent is inflamed by the hope of a reward contingent upon success, and to be graduated by a percentage upon the amount appropriated, the danger of tampering in its worst form is greatly increased.

It is by reason of these things that the law is as it is upon the subject. It will not allow either party to be led into temptation where the thing to be guarded against is so deleterious to private morals and so injurious to the public welfare. In expressing these views, we follow the lead of reason and authority.

We are aware of no case in English or American jurisprudence like the one here under consideration, where the agreement has not been adjudged to be illegal and void.

We have said that for professional services in this connection a just compensation may be recovered. But where they are blended and confused with those which are forbidden, the whole is a unit and indivisible. That which is bad destroys that which is good, and they perish together. Services of the latter character, gratuitously rendered, are not unlawful. The absence of motive to wrong is the foundation of the sanction. The tendency to mischief, if not wanting, is greatly lessened. The taint lies in the stipulation for pay. Where that exists, it affects fatally, in all its parts, the entire body of the contract. In all such cases, *protior conditio defendentis.* Where there is turpitude, the law will help neither party.

The elder agent in this case is represented to have been a lawyer of ability and high character. The appellee is said to be equally worthy. This can make no difference as to

the legal principles we have considered, nor in their application to the case in hand.   The law is no respecter of persons.

DECREE REVERSED, and the case remanded, with directions to

DISMISS THE BILL.