# OWENS *v.* WILKINSON.

ASSIGNMENT OF CLAIMS AGAINST THE UNITED STATES; AGREEEEMENTS
TO PROCURE LEGISLATION; PUBLIC POLICY.

1. An agreement containing an assignment by a claimant to an attorney of an interest in a claim against the Government for services to be performed by the attorney in the prosecution of the claim, is void under Section 3477, R. S. U. S.; and the attorney in an action to recover his fees cannot successfully declare on an oral agreement in precisely the same terms as the written agreement but antedating the latter by two days, and secure the admission in evidence of the written agreement as an admission by the claimant of his employment of the plaintiff at a specified amount of compensation, in support of the declaration; any antecedent oral agreement being merged in the subsequent written contract.
2. An agreement between an attorney and his client for professional services to be rendered by the attorney in the procurement of Congressional legislation, which involves personal solicitation of members of Congress, will not be enforced by the courts, whether improper means are used or not in such solicitation.
3. Where some of the services of the attorney acting under such an agreement, are legitimate and not obnoxious to any rule of public policy, such as the preparation of a brief, yet if the agreement. is one and indivisible and it is impossible to distinguish what is allowed by law from that which is disallowed, there can be no recovery by the attorney on a *quantum meruit* for any part of the services rendered.

No. 1149. Submitted April 4, 1902. Decided May 6, 1902.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia in an action by an attorney to recover compensation for professional services rendered the defendant's decedent in the prosecution of a claim against the United States. *Reversed.*

The COURT in the opinion stated the case as follows:

This is an appeal from a judgment of the Supreme Court of the District of Columbia rendered in a suit instituted in that court by the appellee Ernest Wilkinson, as plaintiff, to recover compensation for professional services rendered by him to the deceased, Thomas Owens.

For some years before 1880 Thomas Owens was an acting assistant surgeon in the United States Navy, of the class known as " contract surgeons,"— that is, surgeons appointed under a special agreement, but having no commissions as officers in the navy. There was also another surgeon, Dr. William Martin, similarly situated, who figures to some extent in the present suit. Both of these men had rendered distinguished service in the various epidemics of yellow fever which had broken out on naval vessels stationed among the West India islands and in the Gulf of Mexico, and had earned high commendation from the naval officers in command and from the medical authorities of the Navy Department. In 1880 Doctors Owens and Martin, under a special act of Congress (21 Stat. 176), were appointed assistant surgeons in the navy, not in the line of promotion. Again, under a special act of October 1, 1890 (26 Stat. 657), the two were appointed as surgeons in the navy, not in the line of promotion, " but in all other respects to be entitled to the rank, pay, emoluments and privileges of surgeons in the Navy of the United States."

Under this enactment both of these gentlemen seemed to have formed the idea that they were entitled to what is known as " longevity pay," which is an increased rate of pay allowed under acts of Congress of 1882 (22 Stat. 284, Chap. 391) and 1883 (22 Stat. 473, Chap. 97) to naval officers, including surgeons, upon a re-entry by appointment into the navy, based upon their previous years of service. The act of 1883 is in the following terms:

"All officers of the navy shall be credited with the actual time they may have served as officers or enlisted men in the regular or volunteer army or navy, or both, and shall receive

all the benefits of such actual service in all respects in the same manner as if all said service had been continuous and in the regular navy, in the lowest grade having graduated pay held by such officer since last entering the service: *Provided,* That nothing in this clause shall be so construed as to authorize any change in the dates of commission or in the relative rank of such officers: *Provided* further, That nothing herein contained shall be so construed as to give any additional pay to any such officer during the time of his service in the volunteer army or navy."

It appears from the record that the pay of surgeons in the navy is increased each five years that they remain in the service, and that if one is *promoted* from a subordinate position he starts with the first five years' pay; but that if he is *appointed* to the position of surgeon he is allowed, in reckoning the rate at which he should be paid as a surgeon, to count all of his previous years of service. It is in the latter contingency that longevity pay seems to be allowed. Doctors Owens and Martin claimed that their position under the act of 1890 was an appointment, and not a promotion; and thereupon claimed before the accounting officers of the Treasury Department to be entitled to longevity pay. These officers rejected the claim, on the ground that the two surgeons had been in effect promoted, and not appointed in the service.

Thereupon the two surgeons employed the appellee Ernest Wilkinson, a practicing lawyer in this city, and who had himself been formerly in the navy, to prosecute their claim; and they executed their several powers of attorney to him and entered into an engagement with him in regard to his compensation. Their contracts seem to have been identical. That of Dr. Owens was in these words:

"Know all men by these presents that I, Thomas Owens, surgeon, U. S. Navy, retired, have made, constituted, and appointed, and by these presents do constitute and appoint, Ernest Wilkinson, of Washington, D. C., my true and lawful attorney irrevocable, for me and in my name, place, and stead, hereby annulling and revoking all former powers of attorney or authorization whatever in the premises, to pre-

sent and prosecute to allowance before Congress or any and
all tribunals before which the same may rightfully come,
my claim against the United States for longevity pay accru-
ing to me since my appointment as a surgeon in the United
States Navy under act of October 1, 1890, hereby assigning
and conveying to my said attorney as a contingent fee for
services rendered and to be rendered an interest in said claim
equal to one-half of the total amount received at the date of
the settlement of said claim by the accounting officers of the
Treasury, which said amount I request to be paid direct to
my said attorney on adjustment of said claim; and I hereby
agree to, from time to time, furnish any further evidence
necessary or that may be demanded, giving and granting to
my said attorney full power and authority to do and perform
all and every act and thing whatsoever requisite and neces-
sary to be done in and about the premises, to include verifica-
tion of any petition or pleadings in the case, as fully to all
intents and purposes as I might or could do if personally
present at the doing thereof, with full power of substitution
and revocation, and to receipt and sign all vouchers, hereby
ratifying and confirming all that my said attorney or his
substitute may or shall lawfully do or cause to be done by
virtue thereof; and I hereby request that any certificates or
drafts in payment thereof be sent to me in care of my said
attorney. This power of attorney does not include any por-
tion of the navy pay proper or any other individual interest
not depending upon the allowance of this claim.

" In witness whereof I hereunto set my hand and seal this
18th day of March, 1896.

            (Signed)                " THOMAS OWENS.    [SEAL.] "

Thereupon Wilkinson examined the claim with a view to
a reversal of the findings by the accounting officers of the
Treasury Department, and also with a view to the institution
of suit in the Court of Claims; but he abandoned both pro-
jects, and concluded that the best, if not the only remedy
was an appeal to Congress to define the status of these officers.
Accordingly, he employed the firm of Shelley, Butler &

Martin, composed of men experienced in that line, to help
him to procure the desired legislation; and he agreed to give
them one-third of whatever amount he received. After con-
sultation with them it was concluded that it was then too
late in the session of Congress to procure a special act for the
purpose; and it was resolved that an attempt should be made
to effect the result by an amendment to the naval appropria-
tion bill, then apparently pending before a committee of the
Senate. Wilkinson prepared an amendment which was in
the following terms:

" Provided, further, that such surgeons in the navy not in
line of promotion as may have been appointed to that position
in accordance with a special act of Congress for meritorious
service during yellow-fever epidemics, shall have all the bene-
fits of their previous service in the same manner as if said
appointments were re-entry into the navy."

What he did thereafter, according to the record, was to
prepare a brief in the case and to have interviews concerning
it with several Senators and Representatives, to each one of
whom he states that he handed a copy of his brief. What
the firm of Shelley, Butler & Martin did does not appear,
and the appellee professes that he does not know, but, to use
his own language, he " got them because they knew their
business." The proposed amendment, at all events, was
offered by a Senator on the floor of the Senate, and was ac-
cepted by the committee having charge of the naval appro-
priation bill. But whether this was effected immediately
through the efforts of the appellee by the means of the Sen-
ators to whom he spoke on the subject, or was the result of the
personal solicitation of Mrs. Owens, the wife of Dr. Owens,
addressed to another Senator, the testimony leaves in some
doubt. The bill, with the amendment, was passed by the
Senate, and went back to the House of Representatives for
concurrence. It went to a conference committee; and the
appellee had interviews with several members of the House
and wrote a letter to one of them, with the view of having
them use their personal influence with the committee of con-

ference for the retention of the amendment. The amendment was retained, and became a law.

There was yet difficulty encountered with the accounting officers of the Treasury, but it was finally surmounted, and the claim of Dr. Owens to the amount of $8,506.29 was allowed. For the purpose of its payment, however, there was no appropriation available beyond the sum of $4,195.06. For this last-mentioned sum a draft was issued to Dr. Owens by the Treasury Department, and he paid one-half of it, that is, the sum of $2,047.53, to the appellee in consideration of his services. This was in July of 1896. For the remainder of the allowance they had to wait until a subsequent session of Congress. The session immediately succeeding failed to make any appropriation; but in an extraordinary session, convened on March 15, 1897, an appropriation was procured. In the meantime, on March 7, 1898, Dr. Owens had died; and on or about September 28, 1898, the residue of the allowance, amounting to $4,311.23, was paid to his widow, Louise M. Owens, who had become the administratrix of his estate. The appellee thereupon made demand upon Mrs. Owens for one-half of this amount in accordance with the contract between himself and Dr. Owens. Mrs. Owens rejected the claim, and refused to comply with the appellee's demand. The appellee then instituted the present suit against her as administratrix. Subsequently, and during the pendency of the suit, Mrs. Owens died; and the present appellant, William Dunlop Owens, son of Dr. and Mrs. Louise M. Owens, having been duly appointed as administrator *de bonis non* of Dr. Thomas Owens, became a party to the suit as defendant.

The declaration in the case contains two counts — one a count upon the special contract alleged to have been entered into between the appellee and Dr. Thomas Owens, " on or about the 16th day of March, 1896," which is not stated to have been in writing, but which, as set forth, was identical in terms with the written contract contained in the paper-writing of March 18, 1896, already mentioned — and the second count being the common counts as usually grouped together. The amount claimed was the sum of $2,155.61, which was

one-half of the payment made to Mrs. Owens as administratrix. The pleas are the general issue.

At the trial there was read in evidence the deposition of Dr. Martin heretofore mentioned. Besides a statement of some of the facts already narrated, his testimony with reference to the contract between himself and the appellee and the contract between Dr. Owens and the appellee, was this:

" I told Dr. Owens that my contract with regard to fees to be paid Wilkinson was that I was to pay him a sum equal to one-half of the amount of back pay allowed at the time of the settlement of the claim, and that longevity pay becoming due for subsequent increase of salary after that time should belong to me. The contract was in writing. Dr. Owens told me that his contract was exactly the same. \* \* \* Mrs. Louise Owens knew of the agreement between Dr. Owens and Wilkinson, and thought that the compensation was too great — that 25 per cent. or 33⅓ per cent. would have been enough."

The appellee himself, the plaintiff in the cause, would seem to have been the only other witness on his own behalf. He testified in substance to the services rendered by him as hereinbefore stated. He commenced his testimony with the introduction in evidence of the paper-writing of March 18, 1896, purporting to be a power of attorney and contract between himself and Dr. Thomas Owens. This paper, the execution of which was admitted by the defense, " was offered as an admission on the part of Dr. Owens of a specified amount of compensation and of employment in support of the first count of the declaration," and was admitted by the trial court for that purpose, over the objection of the defendant. Upon this ruling exception was reserved, and assignment of error is here based.

This was the only objection, as appears from the record, that was interposed by the defense to the plaintiff's testimony on his own behalf. At the end of this testimony a motion was made on behalf of the defendant for an instruction to render a verdict in favor of the defendant, which was refused; and to the refusal exception was taken. But as the

defendant afterwards went into testimony on his own behalf, the exception was waived.

In the testimony for the defense a letter from Wilkinson to Mrs. Owens was produced, which tended to show that Mrs. Owens, with the knowledge and consent of Wilkinson, rendered service and assistance to him in the matter of procuring the desired legislation; and it was admitted in evidence with the right reserved to the plaintiff to have it stricken out, unless it was followed up with proof tending to show that Wilkinson requested her assistance, and that the assistance rendered by her was of such a character as to render the contract void. There was some such proof adduced, but the court regarded it as insufficient; and upon motion of the plaintiff, the letter in question was excluded and stricken from the record. To this ruling an exception was reserved by the defendant.

In connection, however, with this letter the plaintiff testified that it was written in answer to a letter to him from Mrs. Owens a few days previously, which was thereupon introduced by him in evidence, and in which she congratulated him upon his success. To the introduction of this letter objection was made by the defense; but the objection was overruled, and exception was noted. This letter was left in the record after the other letter, which it had been introduced to explain, had been excluded. The defendant, however, made no motion to have it stricken out.

At the conclusion of the testimony the plaintiff seems to have asked for no instructions, although the court charged the jury generally in accordance with his theory of the case. The defendant, however, submitted three several instructions which he desired to be given, and which were in substance: 1st, that the jury should return a verdict for the defendant; 2d, that the jury should return a verdict for the defendant, if they should find that the contract of March 18, 1896, was the only contract between the plaintiff and Dr. Thomas Owens, and that there was no subsequent contract; 3d, that, if the jury believed from the evidence that the contract between Wilkinson and Dr. Owens was for the prosecution of

the latter's claim by the former upon a contingent fee of one-half of the amount that should be recovered, the verdict should be for the defendant, unless the services rendered or to be rendered were of a legitimate and proper character, and were not of the kind known as lobbying services. These instructions were refused.

The verdict and judgment were for the plaintiff for the amount claimed; and the defendant has appealed.

*Mr. Clarence R. Wilson* for the appellant:

1. The court below erred in permitting plaintiff to read in evidence in support of the first count of the declaration the power of attorney, dated 18th March, 1896, signed by Thomas Owens, and empowering plaintiff to prosecute his claim before Congress, etc. This power of attorney was offered in evidence by plaintiff as an admission on the part of Dr. Owens, of a specified amount of compensation and of employment, in support of the first count of the declaration. This power of attorney is void as an instrument creating a legal obligation on the part of Dr. Owens, or as an assignment to Wilkinson of one-half the proceeds of Owens' claim. It is a mere revocable power of attorney and an assignment of a claim against the United States, void under R. S. U. S., Sec. 3477. *Spofford* v. *Kirk,* 97 U. S. 484; *Hagar* v. *Swayne,* 149 U. S. 242; *Ball* v. *Halsell,* 161 U. S. 72. The effect of the admission of the power of attorney in evidence was to give complete validity to a void instrument. If the action had been brought upon the instrument itself no recovery could have been had. But to bring an action on a promise by Owens to pay Wilkinson a certain fee, and then to offer the void power of attorney in evidence to prove the terms of that promise, is, in effect, to bring suit on the void instrument itself.

2. This power of attorney was properly admissible under the second count of the declaration, to prove an admission by Dr. Owens of employment and of a specified amount of compensation, because under the second count plaintiff could

have recovered what his services were reasonably worth; and the power of attorney would have been taken as Dr. Owens' estimate of the worth of such services. But in that event it would have been open to defendant to show that in reality Wilkinson's services were not worth 50 per cent. of the amount finally received. It was in this respect that the error of the court was prejudicial to the defendant. *Lisk* v. *Sherman,* 25 Barb. 433; *Erben* v. *Lorrillard,* 19 N. Y. 299; *Morrell* v. *Cawley,* 17 Abb. Pr. 76; *Insurance Co.* v. *Scott,* 19 Johns. 1.

3. The court below erred in refusing to instruct the jury to return a verdict for the defendant. In view of plaintiff's own testimony, his agreement with Dr. Owens was void as opposed to public policy, according to the principles governing contracts of this nature as established by the Supreme Court of the United States, and by the highest court in almost every State in this country; and there can be no recovery based upon said agreement, nor upon the common counts for services performed. *Marshall* v. *B. & O. Ry.,* 16 How. 325; *Tool Co.* v. *Norris,* 2 Wall. 45; *Trist* v. *Child,* 21 Wall. 441; *Oscanyan* v. *Arms Co.,* 103 U. S. 261; *McMullen* v. *Hoffman,* 174 U. S. 639; *Weed* v. *Black,* 2 MacA. 268; *Wood* v. *McCann,* 6 Dana, 366; *Clippinger* v. *Hepbaugh,* 5 Watts & S. 315; *Gil* v. *Williams,* 12 La. Ann. 219; *Powers* v. *Skinner,* 34 Vt. 274; *Harris* v. *Roof's Exrs.,* 10 Barb. 489; *Rose* v. *Truax,* 21 Barb. 361; *Brown* v. *Brown,* 34 Barb. 534; *Harris* v. *Simonson,* 28 Hun, 318; *Cary* v. *Western Union Tel. Co.,* 47 Hun, 610; *Coquillard's Admr.* v. *Bearss,* 21 Ind. 479; *Houlton* v. *Dunn,* 60 Minn. 26; *Spaulding* v. *Ewing,* 149 Pa. St. 375; *Asphalt Paving Co.* v. *Critchfield,* 62 Ill. App. 221; *Chippewa, etc., Ry.* v. *Chicago, etc., Ry.,* 75 Wis. 224; *Richardson* v. *Scott's Bluff Co.,* 81 N. W. Rep. 309.

The rule as laid down by the Supreme Court has never been modified in the slightest respect. It is true that there are cases which recognize contingent fees as proper, even in the prosecution of claims against the United States, but in all such cases it will be seen that the claim in question was

prosecuted before a commission existing for the very purpose of hearing claims, under a treaty, as in *Wright* v. *Tebbitts,* 91 U. S. 252, and *Taylor* v. *Bemiss,* 110 U. S. 42, or was argued only before the accounting officers of the Treasury Department, as in *Stanton* v. *Embrey,* 93 U. S. 556.

In no case has the Supreme Court sanctioned a contract for prosecuting a claim against the United States in the legislative department of the government for a contingent compensation.

*Mr. Samuel Maddox* for the appellee:

1. The contract as entered into between Dr. Owens and the appellee contravenes no requirement of public policy. *Thornley* v. *United States,* 18 Ct. Cl. 111; *Taylor* v. *Bemiss,* 110 U. S. 80.

2. There was no evidence at the trial that improper influences of any sort were invoked by the appellee to procure congressional action. The counsel for appellant has collected numerous cases which bear upon the general question of lobbying, but the facts of each and every case so cited indicate that sinister means were employed to attain the desired end. In several of the cases cited the courts held that a contingent fee for professional services rendered in preparing and presenting a claim requiring legislative action is void as against public policy. While this may be the law in Pennsylvania, Louisiana, and Indiana, it cannot be so considered in this jurisdiction, since the decision in *Trist* v. *Child,* 21 Wall. 441.

Everything that Mr. Wilkinson did was within the category of legitimate professional services, an agreement for which was declared in that case to be valid. He examined the laws and the rulings of the accounting officers and the courts bearing upon the question of longevity pay; he examined the special acts for the relief of Dr. Owens and Dr. Martin, two worthy men, and the congressional reports wherein their claims to special consideration were set forth; he prepared a remedial amendment to a pending bill, and

wrote a brief advocating its passage. This brief *" was in-tended to reach only the reason,"* and it was handed or sent to several members of Congress, the only " proper authority " he could reach, for it was too late in the session to secure hearings before appropriate committees. It does not appear that he solicited a single vote in favor of the measure as a personal favor, or that he did any single act or thing vio-lative of any requirement of professional ethics. He fulfilled his duty as a lawyer, and greater praise cannot be bestowed upon any one.

The books abound in cases where persons having claims against national or State governments, after procuring the desired remedial legislation, dishonestly seek to avoid paying counsel the agreed compensation on the ground that improper influences were brought to bear upon members of the legis-lature. At the same time, as here, they seek to retain for their own use the fruits of the lawyer's labors. A few of these cases are: *Denison* v. *Crawford Co.,* 48 Iowa, 211; *Russell* v. *Burton,* 66 Barb. 539; *Lyon* v. *Mitchell,* 36 N. Y. 235; *Kansas Pacific Ry. Co.* v. *McCoy,* 8 Kan. 359 (1871).

Mr. Justice MORRIS delivered the opinion of the Court:

Two principal questions are raised by the appeal in this case: 1st, whether the contract entered into by the appellee and Dr. Thomas Owens was a valid contract under which the appellee was entitled to recover in this suit; 2d, whether the services contracted for and rendered by the appellee were of such a character as that the law will allow the recovery of compensation for them.

1. Apparently the contract here sued on is not the written contract contained in the power of attorney of March 18, 1896, but an antecedent oral contract of the same precise tenor and effect made on March 16, 1896, two days before the execution of the written contract. Accordingly the first count of the declaration, while setting forth an express and specific contract, makes no mention of the written instru-ment and no reference thereto. This course is understood

to have been pursued for the reason that the written contract is admitted to be null and void in consequence of the provisions of section 3477 of the Revised Statutes of the United States. But the written contract was introduced in evidence, and reliance was placed upon it by the appellee to prove the antecedent oral contract. As stated in the bill of exceptions, it " was offered as an admission on the part of Dr. Owens of a specified amount of compensation and of employment, in support of the first count of the declaration;" and it was admitted by the trial court for that purpose. And there was no other proof of the agreement between the parties and of the services to be rendered. For, although Dr. Martin testifies in that regard, his testimony merely leads back to the written contract.

Now, we are at a loss to understand what purpose in law there was to be subserved by ignoring the written contract and declaring upon a preceding oral agreement of the same precise tenor and effect, when the only proof of the antecedent oral agreement was the written contract. It is an elementary rule of law that all antecedent oral agreements are merged in subsequent written contracts, when such agreements have been reduced to writing. *Ins. Co.* v. *Mowry,* 96 U. S. 544; *Oericks* v. *Ford,* 23 How. 49; Greenleaf on Evidence, Vol. 1, Sec. 275. If the antecedent oral agreement is of the same tenor and effect as the subsequent writing, it is useless to recur to it; if it is different from the subsequent writing, the latter will be presumed to embody the final understanding between the parties, and it will not be permitted to be varied or contradicted by the antecedent oral agreement — except, of course, in a suit to reform the written contract.

Nor is it apparent why, if the written contract is void under the statute, the oral agreement of the same precise tenor and effect can be valid. The statute does not render such contracts invalid because they are in writing, but on account of their nature and character; and an oral agreement to do what is forbidden by the law is equally obnoxious as a written contract.

The statute reads as follows:— "All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or of any part or share thereof, shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof." U. S. Rev. Stat., Sec. 3477.

Here, in express terms by the written contract, and equally so by the antecedent oral agreement, if the written instrument is to be taken for what it was offered in evidence, an admission of the " specified amount of compensation " to be paid to the appellee, that compensation consisted in the assignment by Dr. Owens to the appellee of " an interest in said claim equal to one-half of the total amount received at the date of the settlement of said claim by the accounting officers of the Treasury." The assignment is distinct and positive of an " interest in the claim " amounting to one-half of it; and it is difficult to see how there could have been an agreement more directly or more plainly in contravention of the statute, or more in violation of that which the law-making power sought by the enactment to prohibit. That the consideration may have been a meritorious one is, of course, of no consequence in view of the express language which prohibits assignments of such claims for any consideration whatever.

Directly in point are repeated decisions by the Supreme Court of the United States. *Ball* v. *Halsell,* 161 U. S. 72; *Hager* v. *Swayne,* 149 U. S. 242; *Spofford* v. *Kirk,* 97 U. S. 484. In this last-cited case of *Spofford* v. *Kirk* it was held that, as between the assignor and the assignee in good faith of an interest in a claim against the United States, the assignment was null and void and could not be enforced. And in the most recent case on the subject, that of *Ball* v. *Halsell,* above cited, where there was a contract similar to that here

involved and a similar suit to enforce it, the Supreme Court of the United States, by Mr. Justice Gray, reviewing numerous cases on the subject, held that the decision in the case of *Spofford* v. *Kirk* had never been overruled or questioned by the court, although various exceptions to it had been admitted, which are referred to in the opinion, but none of which have any bearing on the case now before us. This case plainly falls under the general rule there enunciated and repeated.

Apparently antagonistic are the cases of *Wylie* v. *Coxe*, 15 How. 415; *Wright* v. *Tebbitts*, 91 U. S. 252; *Stanton* v. *Embrey*, 93 U. S. 548; and *Taylor* v. *Bemiss*, 110 U. S. 42; and to these Mr. Justice Gray refers in the case of *Ball* v. *Halsell*; and he finds nothing in them at variance with the views expressed by him in this last-mentioned case. It will be found that in most of them only the doctrine is established that parties may lawfully stipulate for the payment of large contingent fees in such cases. In the case of *Taylor* v. *Bemiss*, Mr. Justice Miller, speaking for the Supreme Court, said:

" It remains to be considered whether there is in this contract of employment anything which, after it has been fully executed on both sides, should require it to be declared void in a court of equity, and the money received under it returned. It was decided in the case of *Stanton* v. *Embrey*, 93 U. S. 548, that contracts by attorneys for compensation in prosecuting claims against the United States were not void because the amount of it was made contingent upon success, or upon the sum recovered. And the well-known difficulties and delays in obtaining payment of just claims which are not within the ordinary course of procedure of the auditing officers of the Government, justifies a liberal compensation in successful cases, where none is to be received in case of failure. Any other rule would work much hardship in cases of creditors of small means residing far from the seat of Government, who can give neither money nor personal attention to securing their rights." 110 U. S. 42.

It would seem that in this case of *Taylor* v. *Bemiss* there had been a contract made between the parties for a fee of

fifty per cent of the amount that might be recovered, or perhaps a fee equal to fifty per cent of such amount — for the distinction, though subtle, is well established, the one conveying an interest in the fund to be recovered, the other being merely a personal obligation the extent of which is to be measured by the amount of recovery — and that the fee had actually been paid to the attorneys or in some manner received by them. Thereupon suit was instituted in equity to recover the amount; and the court held that the fee was not an improper one under the circumstances, and that the contract having been fully executed on both sides there could be no recovery.

There is no need of elaborate argument in support of such a proposition as this, if argument were proper at all. The contract was in itself just; it had been fully executed; the fee had been paid; and it was certainly not a case where a court of equity should lend its aid to recover back money paid under such circumstances. But an executory contract invalidated by law stands upon a very different basis, when a court of common law is called upon directly to enforce it in the face of the prohibition of the statute.

In the latest case on this statute in the Supreme Court, that of *Price* v. *Forrest,* 173 U. S. 410, wherein the opinion was delivered by Mr. Justice Harlan, and which was a contest between the heirs of a claimant after his death and a receiver appointed in a proceeding instituted by his creditors, it was held that the receiver was entitled to the fund, thereby affirming a decree of the Court of Errors and Appeals of New Jersey to the same effect. The court said:

"As this court has said, the object of Congress by section 3477 was to protect the Government, and not the claimant, and to prevent frauds upon the Treasury. *Bailey* v. *United States,* 109 U. S. 432; *Hobbs* v. *McLean,* 117 U. S. 567; *Freedman's Savings Co.* v. *Shepherd,* 127 U. S. 494, 506. There was no purpose to aid those who had claims for money against the United States in disregarding the just demands of their creditors. We perceive nothing in the words or object of the statute that prevents any court of competent juris-

diction as to subject-matter and parties from making such
orders as may be necessary or appropriate to prevent one
who has a claim for money against the Government from
withdrawing the proceeds of such claim from the reach of his
creditors; provided such orders do not interfere with the ex-
amination and allowance or rejection of such claim by the
proper officers of the Government, nor in anywise obstruct
any action that such officers may take legally under the stat-
utes relating to the allowance or payment of claims against
the United States. If a court, in an action against such
claimant by one of his creditors, should, for the protection of
the creditor, forbid the claimant from collecting his demand
except through a receiver who should hold the proceeds sub-
ject to be disposed of according to law under the order of
court, we are unable to say that such action would be incon-
sistent with section 3477."

While the reasoning of this case would seem to be antago-
nistic to that in the cases of *Spofford* v. *Kirk* and *Ball* v.
*Halsell,* yet it is evident from the whole tenor of the opinion,
which refers in terms to the case of *Ball* v. *Halsell* as be-
longing to a different class, that there was no intention to
overrule or modify these cases. It was intended merely to
add another exception to those mentioned in the case of *Ball*
v. *Halsell;* and the distinction is plainly indicated between
the case of a creditor, who becomes such by a voluntary as-
signment of the claim or of an interest in it to him, and other
creditors who are seeking through a court of competent juris-
diction to reach assets of their debtor for the satisfaction of
their just claims.

In a yet more recent case in this court, that of *Sanborn* v.
*Maxwell,* 18 App. D. C. 245, we had the same statute under
consideration; and we held, under the authority of the case
of *Price* v. *Forrest,* that it did not apply to the condition of
things there presented. The case was of the same nature as
that of *Price* v. *Forrest;* and it appeared that the United
States had no interest in the matter.

Constrained by the express terms of the statute and by
the decision of the Supreme Court of the United States in

the case of *Ball* v. *Halsell,* we must hold that, whether the contract relied upon by the appellee be the written contract of March 18, 1896, or the entirely identical oral agreement of March 16, 1896, there can be no recovery upon it in this suit.

2. But it does not follow from this that there may not be a right to recover under the common counts for a *quantum meruit,* if the services rendered by the appellee or stipulated to be rendered by him were such as the law would approve and were not against public policy. It is argued on behalf of the appellant that they were in contravention of public policy, and therefore that no recovery can lawfully be had for them. And this is the second question in the case. But we apprehend that, under repeated decisions of the Supreme Court of the United States, this question also must be resolved against the contention of the appellee.

It appears very plainly from the record that the services contemplated to be rendered and which were in fact rendered consisted mainly in the procurement of legislation by the Congress of the United States and in personal solicitations of members of Congress for that purpose. That, for the accomplishment of this purpose, there were no improper or unlawful means used or intended to be used, may well be conceded; and that some of the means used, such as the preparation of a brief to be laid before some of the committees of Congress or handed to individual members of that body, were eminently praiseworthy and such as a lawyer might very properly render for the benefit of his client, may also be conceded. But that there was personal solicitation used in the procurement of the desired legislation, is very evident. Now this is what the Supreme Court of the United States has condemned. *McMullen* v. *Hoffman,* 174 U. S. 639; *Trist* v. *Child,* 21 Wall. 441; *Tool Co.* v. *Norris,* 2 Wall. 45; *Marshall* v. *B. & O. RR. Co.,* 16 How. 314.

In the case of *Marshall* v. *B. & O. RR. Co.,* the court, by Mr. Justice Grier, said, after a review of the cases then adduced in argument: "The sum of all these cases is, 1st, that all contracts for a contingent compensation for obtaining

legislation, or to use personal or any secret or sinister influence on legislators, are void by the policy of the law."

In the case of *Tool Co.* v. *Norris,* 2 Wall. 45, the Supreme Court, by Mr. Justice Field, said, with reference to a contract to procure a contract from the Government to furnish supplies to it:

"All contracts for supplies should be made with those, and with those only, who will execute them most faithfully and at the least expense to the Government. Considerations as to the most efficient and economical mode of meeting the public wants should alone control in this respect the action of every department of the Government. No other consideration can lawfully enter into the transaction, so far as the Government is concerned. Such is the rule of public policy; and whatever tends to introduce any other elements into the transaction, is against public policy. That agreements, like the one under consideration, have this tendency, is manifest. They tend to introduce personal solicitation and personal influence as elements in the procurement of contracts, and thus directly lead to inefficiency in the public service and to unnecessary expenditures of the public funds.

" The principle which determines the invalidity of the agreement in question has been asserted in a great variety of cases. It has been asserted in cases relating to agreements for compensation to procure legislation. These have been uniformly declared invalid, and the decisions have not turned upon the question, whether improper influences were contemplated or used, but upon the corrupting tendency of the agreements. Legislation should be prompted solely from considerations of the public good and the best means of advancing it. Whatever tends to divert the attention of legislators from their high duties, to mislead their judgments, or to substitute other motives for their conduct than the advancement of the public interests, must necessarily and directly tend to impair the integrity of our political institutions. Agreements for compensation contingent upon success suggest the use of sinister and corrupt means for the accomplish-

ment of the end desired. The law meets the suggestion of evil, and strikes down the contract from its inception.

"There is no real difference in principle between agreements to procure favors from legislative bodies, and agreements to procure favors in the shape of contracts from the heads of departments. The introduction of improper elements to control the action of both, is the direct and inevitable result of all such arrangements." * * *

"It is sufficient to observe, generally, that all agreements for pecuniary considerations to control the business operations of the Government, or the regular administration of justice, or the appointments to public offices, or the ordinary course of legislation, are void as against public policy, without reference to the question, whether improper means are contemplated or used in their execution. The law looks to the general tendency of such agreements; and it closes the door to temptation by refusing them recognition in any of the courts of the country."

In the case of *Trist* v. *Child,* in which the case of *Tool Co.* v. *Norris,* among others, was cited and approved, the Supreme Court, by Mr. Justice Swayne, with reference to a contract for the prosecution of a claim before Congress, said:

"We entertain no doubt that in such cases, as under all other circumstances, an agreement express or implied for purely professional services is valid. Within this category are included, drafting the petition to set forth the claim, attending to the taking of testimony, collecting facts, preparing arguments, and submitting them orally or in writing to a committee or other proper authority, and other services of like character. All these things are intended to reach only the reason of those sought to be influenced. They rest on the same principle of ethics as professional services rendered in a court of justice, and are no more exceptionable. But such services are separated by a broad line of demarcation from personal solicitation, and the other means and appliances which the correspondence shows were resorted to in this case. There is no reason to believe that they involved

anything corrupt or different from what is usually practiced by all paid lobbyists in the prosecution of their business.

" The agreement in the present case was for the sale of the influence and exertions of the lobby agent to bring about the passage of a law for the payment of a private claim, without reference to its merits, by means which, if not corrupt, were illegitimate, and considered in connection with the pecuniary interest of the agent at stake, contrary to the plainest principles of public policy. No one has a right in such circumstances to put himself in a position of temptation to do what is regarded as so pernicious in its character. The law forbids the inchoate step and puts the seal of its reprobation upon the undertaking."

In the case of *McMullen* v. *Hoffman,* which is apparently the last enunciation of the Supreme Court on this question, the principle of the case of *Tool Co.* v. *Norris* is unqualifiedly indorsed.

To the same effect was the case of *Weed* v. *Black,* 2 MacA. 268, in the Supreme Court of the District of Columbia; and likewise numerous cases in the several States of the Union. *Wood* v. *McCann,* 6 Dana, 366; *Clippinger* v. *Hepbaugh,* 5 Watts & Serg. 315; *Spalding* v. *Ewing,* 149 Pa. St. 375; *Powers* v. *Skinner,* 34 Vt. 274; *Harris* v. *Roof,* 10 Barb. 489; *Rose* v. *Truax,* 21 Barb. 361; *Brown* v. *Brown,* 34 Barb. 533; *Gil* v. *Williams,* 12 La. Ann. 219; *Coquillard* v. *Bears,* 21 Ind. 479; *R.R. Co.* v. *Chicago R'Way,* 75 Wis. 224; *Houlton* v. *Dunn,* 60 Minn. 26; *Richardson* v. *Scott's Bluff Co.,* 81 N. W. Rep. 309.

There are, it is true, various decisions apparently to the contrary, several of which are cited in the brief for the appellee: as *Denison* v. *Crawford Co.,* 48 Iowa, 211; *Russell* v. *Burton,* 66 Barb. 539; *Lyon* v. *Mitchell,* 36 N. Y. 235; *Kansas Pacific Railway Co.* v. *McCoy,* 8 Kans. 359; *Chesebrough* v. *Conover,* 140 N. Y. 382.

In one of these cases, that of *Lyon* v. *Mitchell,* 36 N. Y. 235, the Court of Appeals of the State of New York, by Mr. Justice Hunt, upheld the validity of an agreement to procure a contract from the Government, and condemned the case of

*Tool Co.* v. *Norris* to the contrary. But the force of the decision is greatly impaired by the fact that Mr. Justice Hunt afterwards in the Supreme Court of the United States, in the case of *Trist* v. *Child, supra,* concurred in the decision of that case, wherein the authority of the case of *Tool Co.* v. *Norris,* was cited with approval. Some of these cases upon examination will be found to fall within the exceptional cases, noted in *Trist* v. *Child,* wherein professional services may lawfully be rendered. And so far as any of them are in antagonism to the principle laid down as the law by the Supreme Court of the United States, they are wholly without force or authority for us.

As we understand it, the rule to be deduced from the decisions of the Supreme Court of the United States which have been cited, is this — that agreements for professional services in the procurement of Congressional legislation, which involve personal solicitation of members of Congress, will not be enforced by the courts, whether improper means are used or not in such solicitation. Here there was undoubtedly personal solicitation of several members of Congress. It is not charged that any improper means were sought to be used to control their action, and in all probability none such were used; but the personal solicitation was of the kind that has been reprobated by the Supreme Court as tending to lead all concerned in it to the temptation to disregard the public interest for the sake of private emolument. It may be remarked that in most cases it would be difficult, if not impossible, to prove the use of improper means to influence the action of those who are thus approached; and that for this reason also, as well as to remove the occasion of temptation, the courts refuse to lend their aid where there is any personal solicitation whatever, whether in itself legitimate or illegitimate.

In view of this doctrine laid down by the Supreme Court of the United States, we must hold that there can be no recovery by the appellee for his services in the premises. And while, as already stated, some of those services were undoubtedly legitimate and not obnoxious to any rule of public

policy, such as the preparation of a brief, yet inasmuch as the contract was one and indivisible, and it is impossible to distinguish what was allowed by law from that which was disallowed, there can be no recovery for any part of the services. What was said in the case already cited of *Trist* v. *Child, supra,* is appropriate. There the court said:

"We have said that for professional services in this connection a just compensation may be recovered. But where they are blended and confused with those which are forbidden, the whole is a unit and indivisible. That which is bad destroys that which is good, and they perish together."

From what we have said it follows that the judgment appealed from must be *reversed, with costs. And it is so ordered.*

A petition by the appellee to the Supreme Court of the United States for a writ of *certiorari* to this court, was denied.