## ALLISON v. DODGE.

(Circuit Court of Appeals, Third Circuit. March 3, 1923.)

No. 2935.

**1. Contracts ⬤═▷131—Agreement to pay for personal influence with government officer is void.**

The personal influence of an individual with an officer of the government is not a subject for barter and sale, and a contract to pay for the exercise of such influence to induce the officer to enter into a contract is contrary to public policy and void.

**2. Contracts ⬤═▷131—Agreement to pay commission for presenting merits of article to government officer is valid.**

An agreement to pay either a stipulated compensation or a commission for services rendered in presenting to a government officer the merits of an article or the fitness of a concern to perform a contract is not contrary to public policy and is valid.

**3. Contracts ⬤═▷142—Evidence held to raise jury question as to whether commission was for personal influence of plaintiff with government officer.**

In an action on a contract to pay plaintiff a commission for securing war munitions orders for defendant, evidence *held* to raise a question for the jury as to whether the payment was to be made to secure the personal influence of plaintiff with a government officer, or was made for the legitimate purpose of inducing the plaintiff to present the qualifications of defendant to perform the contract before the proper officers, so that it was error to grant a nonsuit on the ground that the contract was void as against public policy.

In Error to the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Action at law by J. Wesley Allison against M. Hartley Dodge. Judgment for defendant, and plaintiff brings error. Reversed and remanded for a new trial.

Jesse W. Johnson, of Brooklyn, N. Y. (Andrew F. Van Thun, Jr., of Brooklyn, N. Y.; of counsel), for plaintiff in error.

McCarter & English, of Newark, N. J. (Robert H. McCarter, of Newark, N. J., Chauncey B. Garver, of New York City, and George W. C. McCarter, of Newark, N. J., of counsel), for defendant in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. J. Wesley Allison, a British subject residing in Canada, brought this action against M. Hartley Dodge, a citizen of New Jersey, doing business under the name of Remington Arms-Union Metallic Cartridge Company, to recover, under contract, a commission of fifteen cents each on 797,438 eighteen pounder brass cases sold by the defendant to the British Government. The District Court entered judgment of nonsuit on the ground that the contract, if made, was not enforceable because contrary to public policy. The case is here on the plaintiff's writ of error.

The testimony shows there were two transactions between Allison and the Remington Arms involving the procurement of munitions contracts and payment of commissions. On one, no suit was brought because the commissions were paid. On the other, this suit was

⬤═▷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

brought because the commissions were not paid. The trouble at the trial, we think, grew out of confusing these two transactions and failing clearly to distinguish them. On this review, therefore, it is necessary first to determine just what is the precise subject matter of this litigation, or, in plain words, just what is this case about.

At the outbreak of the war Colonel Sam Hughes became Minister of Munitions and Defense of the Dominion of Canada and as such represented the British Government in obtaining certain munitions. Allison, a broker by occupation, had been his close friend for many years. Hughes asked Allison to go to New York and get prices on many things needed for war; horses, saddles, blankets, clothing, munitions, etc. It does not appear that Allison was employed by Hughes, or that he acted in any official capacity, or was vested with authority either to propose or to close contracts. On coming to the United States Allison visited the Remington Arms, where he met Pryor, Chairman of the Executive Committee. By Pryor he was introduced to Bruff, Chairman of the Board of Directors. (The defendant's business appears to have been organized on the plan of a corporation.) It developed that the Remington Arms was as anxious to sell munitions as the British Government was to buy them. So, after some negotiations, Bruff went to Ottowa where Allison introduced him to Hughes with the result that the Remington Arms obtained a contract for the sale of several million rifle cartridges to the British Government. For his services, whatever they were, the Remington Arms paid Allison a very large commission. This was the first transaction. Neither with it, nor with its implications as they affect both Allison and the Remington Arms have we any present concern. We refer to this transaction only to show that it is *not* the cause of action in this suit.

The second transaction, the one out of which this suit grew, came about in this way:

The Remington Arms learned (not through Allison but through another source) that the British Government (not Colonel Sam Hughes or the Canadian Government) was about to award a contract for brass shell cases of the kind used on projectiles for 18-pound guns. Knowing that Allison had close relations with Colonel Sam Hughes, Bruff and Pryor, the principal officers of the Remington Arms, went to Allison—differing from the other transaction in which Allison went to the Remington Arms—and acquainted him with the proposed contract and stated that they wanted blue prints and specifications of the shell cases which they knew were in the Canadian Arsenal and requested him to get them. They wanted these blue prints and specifications for the perfectly proper purpose of ascertaining the dimensions of the cases and their metal content so that they could do two things: First, estimate the cost and thereafter a bidding price for the article; and second, immediately to set about making extra dies, jigs, etc. so that in the event their company was awarded the contract it could start upon its performance at once. Thus was business done in the exigency of war. Allison replied that he thought he could get these things and did get them, or some of them. At all events, from

the information which Allison supplied the Remington Arms, that concern was put in position to estimate cost price and selling price of the cases, which it did at the figures of eighty cents and one dollar and eighty cents respectively, and also to equip its plant, in anticipation of the contract, with the requisite dies, jigs, etc. at the small cost of $2,500. This was in September, 1914. Thus far no one claims anything sinister in the transaction.

On September 30, 1914, Bruff or Pryor, acting for the Remington Arms, called upon Allison and engaged him to use his efforts in procuring the contract, promising him a commission of fifteen cents per case. It appears that this contract was to be awarded, not by Colonel Sam Hughes, but by the British War Office in London. The only connection between Hughes and the Remington Arms in the matter seems to be a telegram from Hughes directing the Remington Arms to proceed with the manufacture of tools and stating that he would cable from England what quantities were wanted.

The engagement of Allison required him to go to England, but before he went he demanded that the oral promise of the Remington Arms to pay him commissions be put in writing and obtained from it a letter, bearing date October 13, 1914, wherein the Remington Arms promised to pay him "a commission of fifteen cents each on the brass cases 18 pdr. as these are shipped and paid for."

Allison went to England, taking with him letters to Lord Kitchener, General Sir Stanley VonDonlop and others. On arriving in London he obtained through Colonel Sam Hughes a personal introduction to Lord Kitchener. On bringing up the matter of the case contract, Lord Kitchener referred him to Sir Arthur Fitzgerald, his military secretary. With this introduction from Lord Kitchener, Allison saw Sir Arthur Fitzgerald and sought from him the case contract for the Remington Arms, explaining the reliability of that concern and its facilities for manufacturing munition parts of that kind. He also saw General Sir Stanley VonDonlop, Chief of Ordinance, to whom he made like representations. VonDonlop referred him to Winter, the Director of Contracts, with whom he had similar conversations. Pending these negotiations Allison kept in touch with Hollick, the London agent of the Remington Arms, to whom Bruff had given him a letter of introduction. While Allison was carrying on these negotiations the Remington Arms terminated them by cable, stating that its capacity was full. It then procured the contract through other channels and when this was discovered by Allison about a year later it refused to pay him his commissions. Thereupon Allison brought this suit for commissions, declaring on an express contract and the quantum meruit. The Remington Arms pleaded the general issue of non assumpsit and a special plea that the contract was not enforceable because against good morals and public policy.

The case was mainly tried on the issue raised by the special plea. The defense made by the Remington Arms on this plea was that, if it entered into the contract, then it employed Allison to use improperly his relation with Colonel Sam Hughes and his position in the Canadian Government, and that in carrying out the contract Allison act-

ed in violation of the law of Oscanyan v. Arms Co., 103 U. S. 261, 26 L. Ed. 539. The learned trial judge took the same view and directed the judgment of nonsuit.

At the trial, as at the hearing in this court on writ of error, no one questioned the law of the Oscanyan case and kindred cases. The law of that case is so well established that we need not refer to other cases. But there are two rules of law in that case. Therefore the question is which rule applies to this case.

Reviewing the Oscanyan case briefly, it appears that the Turkish government sent Rustem Bey, an officer of high rank in its service, to the United States to examine and report in regard to the purchase of arms and machinery. Oscanyan was then consul-general of the Ottoman government at the port of New York. The two men had been friends. On his arrival in this country Rustem Bey made Oscanyan's office his headquarters, and there all his interviews and negotiations with manufacturers of arms were held. The manufacturers soon became aware of the relation of the man and on being approached Oscanyan freely entered into contracts for the sale of his influence with the Bey for the purchase of arms. Among others, the Winchester Repeating Arms Company entered into a contract with Oscanyan to pay him commissions on all arms bought by the Turkish government on the recommendation of the Bey thus influenced. Arms were purchased under this arrangement but the Winchester Company refused to pay Oscanyan the commissions it had promised. Suit and trial followed. On proof of the contract and on a statement of the facts supporting it, the trial court without hearing evidence directed a verdict for the defendant for reasons later sustained and discussed by the Supreme Court on writ of error.

[1] It is first to be noted that Oscanyan, like Allison, was not the agent of his government entrusted with the purchase of arms. If there is any similarity between the positions of the two men it is because Oscanyan, like Allison, was the friend of, and for that reason was thought to have influence with, an official who, to a limited extent, was the purchasing agent for his government. In such a situation the Supreme Court held, on the question whether the contract was one which the court will enforce, that:

"The contract was a corrupt one,—corrupt in its origin and corrupting in its tendencies. The services stipulated and rendered were prohibited by considerations of morality and policy which should prevail at all times and in all countries, and without which fidelity to public trusts would be a matter of bargain and sale, and not of duty."

Bringing the law closer to this case, the Supreme Court continued:

"But, independently of the official relation of the plaintiff to his government, the personal influence which he stipulated to exert upon another officer of that government was not the subject of bargain and sale. Personal influence to be exercised over an officer of government in the procurement of contracts, as justly observed by counsel, is not a vendible article in our system of laws and morals, and the courts of the United States will not lend their aid to the vendor to collect the price of the article. * * * This is true when the vendor holds no official relations with the government, though the turpitude of the transaction becomes more glaring when he is also its officer."

This is one rule of law laid down in the Oscanyan case.

[2] Discussing the distinction made in Trist v. Child, 21 Wall. 441, 22 L. Ed. 623, between the use of personal influence to secure legislation and legitimate professional services in reference to legislation, the Supreme Court held that, while the former is condemned, the latter are, within certain limits, regarded as appropriate subjects for compensation. Continuing by analogy, the court said:

"So, too, with reference to furnishing the government with arms or supplies of any kind. It is legitimate to lay before the officers authorized to contract, all such information as may apprise them of the character and value of the articles offered, and enable them to act for the best interests of the country. And for such services compensation may be had as for similar services with private parties, either upon a quantum meruit, or, where a sale is effected, by the ordinary brokerage commission."

This is the other rule of law of the Oscanyan case.

How shall it be determined by which of these rules is the instant case controlled? The matter was plain enough in the Oscanyan case because there the facts were not in dispute and were susceptible of but one inference—the inference of a corrupt contract. Following closely the Oscanyan case, the learned trial judge in the instant case himself drew the inference of a corrupt bargain and accordingly denied its enforcement. But here the testimony is in dispute and is susceptible of different inferences, and until the facts are found it is impossible to determine which rule of the Oscanyan case is to be applied.

[3] The testimony in the case at bar, as developed on direct examination and cross-examination, discloses two distinct questions of fact. The first is: Did Allison, by reason of his friendship with a purchasing agent of the British government, contract to use his influence with that agent, or, without contract, did he influence that agent, in an endeavor to secure the case contract for the Remington Arms? The next question is: Did the Remington Arms make Allison its agent in the matter of the case contract and did Allison in the performance of a contract of agency legitimately lay the claims of his employer before government officers authorized to contract?

It is not until these questions have been answered that a court can apply the law in this case; and as these questions are purely questions of fact, the only forum capable of answering them is a jury. If, on submission, the jury should answer the first question in the affirmative, then clearly the first rule of the Oscanyan case controls and the contract is corrupt and unenforceable. If the jury should answer the second question in the affirmative, then the second rule of the Oscanyan case controls and the contract is valid and enforceable. There is enough evidence for a jury to answer either question in the affirmative or in the negative and accordingly enough evidence to sustain a verdict either way. For these reasons we think the trial court fell into error in applying the law to this case before the jury had determined the facts.

The plaintiff in error has filed seventeen assignments of error. All except one were addressed to rulings of the court on the admission and rejection of testimony. This one was addressed to error of the

287 F.—40

court in entering judgment of nonsuit. In his briefs and at the hearing on this writ, the plaintiff in error pressed this single assignment. Assuming that he had abandoned all others, the defendant in error met this one assignment. We are disposed therefore to consider it alone. If errors may be found on some of the remaining assignments, they doubtless were due to the view which the trial court took of the case and to its theory of trial. On a retrial, involving the submission of the basic issues of fact we have suggested, such errors, if any, are not likely to recur. Therefore, limiting our decision to the error found in the seventeenth assignment, we must direct that the judgment below be reversed and the case remanded for a new trial.