### TEXAS FARM BUREAU COTTON ASS'N v. DAVIS. (No. 2257.)

Court of Civil Appeals of Texas. El Paso. April 18, 1929.

Rehearing Denied May 2, 1929.

C. K. Bullard, Holland, Bartlett, Thornton & Chilton, and Geo. Purl, all of Dallas, for appellant.

Davis & Hatchell, of Dallas, for appellee.

PELPHREY, C. J. Appellee, John Davis, sued appellant, Texas Farm Bureau Cotton Association, to recover a balance of $3,000 alleged to be due upon a contract of employment to assist appellant in the passage of certain bills then pending before the Legislature of the state of Texas.

Appellee alleged that two certain letters, which he incorporated in his petition, constituted the contract between the parties. The letters read:

"Dallas, Texas, January 22, 1927.

"Mr. C. K. Bullard, Attorney, Texas Farm Bureau Cotton Association, Dallas, Texas. Dear Sir: Further referring to the matter of my services as attorney for the Texas Farm Bureau Cotton Association to aid you with a bill you desire to have enacted by the Legislature of Texas, beg to advise you that I shall be pleased to leave Dallas Sunday night and be in Austin Monday morning and aid you in presenting this matter to members of the Legislature by appearing before the proper committees and interviewing individual members as may appear proper and necessary.

"Please let me have your check or voucher for $50.00 to apply on my expenses, as well as an additional check or voucher for $500.00 for my fee for services in this connection. This will be in full of my fee and expenses, in the event I conclude my work by Tuesday evening. If I am required to remain longer or to return to Austin at a later day, I shall make additional charges on the same basis as here stated.

"Very truly yours,

"[Signed] John Davis."

"January 22, 1927.

"Hon. John Davis, Dallas, Texas—Dear Mr. Davis: Inclosed please find copy of bill being sponsored by Texas Farm Bureau Cotton Association in the Legislature which I desire you to assist me in its passage.

"I have just received your letter of this date regarding the fee arrangement which is agreeable. I will have the association issue you a check for the $500.00 fee, and on your return you can furnish me with statement of your expenses, and I will see that same is paid. I presume that this will be more agreeable than the plan you suggest, since I do not know just how many days it will take.

"I will take the Sunday noon train, or Sunday night train (Katy) for Austin, and, should I miss you on the train, I will meet you at Stephen F. Austin Hotel Monday morning at 8:30.

"Very truly yours,

"[Signed] C. K. Bullard."

Mr. Bullard is alleged to have been the attorney for appellant, and to have been acting within the scope of his employment in contracting with appellee. He was made a party defendant, but his general demurrer was sustained, and he was dismissed out of the case.

At the conclusion of the testimony, upon motion of appellee, the jury was instructed to return a verdict against appellant for the full amount of appellee's claim. From the judgment rendered upon the instructed verdict, the Texas Farm Bureau Cotton Association has perfected an appeal to this court.

Opinion.

Appellant presents 5 assignments of error, and upon them predicates 12 propositions. The questions presented, briefly stated, are these: (1) The court erred in overruling appellant's general demurrer to appellee's petition, for the reason that the contract pleaded upon its face showed to be against public policy and in violation of article 180 of the Penal Code and therefore void; (2) the court erred in overruling appellant's motion for an instructed verdict because (a) the undisputed evidence showed the contract to be against public policy and in violation of article 180 of the Penal Code; (b) the evidence of appellee failed to establish the agency of C. K. Bullard in the execution of the contract; (c) the evidence of appellee failed to show any ratification by it; (d) the evidence failed to show that the oral contract was to be superseded by the written one; (e) the evidence of appellee failed to show any consideration for the written contract; (f) the evidence of

appellee shows that he breached the written contract in failing to interview individual members of the Legislature as he agreed; and (g) the evidence of appellee failed to show that C. K. Bullard was acting within the apparent scope of his authority in making the written contract; (3) the court erred in granting appellee's motion for an instructed verdict, because (a) the evidence showed that the minds of appellee and Bullard did not meet on the amount of fee, and, therefore, that question should have been submitted to the jury; (b) the undisputed evidence showed that appellant did not authorize Bullard to make a contract for a fee of more than $500; (c) the evidence fails to show a consideration for the written contract; (d) the evidence introduced by appellant showed that appellee privately solicited the votes of individual members of the Legislature, and privately endeavored to exercise influence upon them in behalf of the bill; (e) and the evidence showed that it was within the contemplation of the parties, at the time of the execution of the contract, that appellee would privately solicit the votes of the individual members and privately endeavor to influence them; and (4) that the verdict and judgment were contrary to both the law and the evidence.

■ On the question of lobbying, our Penal Code has the following to say:

Article 179: "If any person having any direct interest, or the president or any other officer of any corporation having any direct interest in any measure pending before, or thereafter to be introduced in either branch of the Legislature of this state, in any manner, except by appealing to his reason, privately attempt to influence the action of any member of such Legislature, during his term of office, concerning such measure, he shall be deemed guilty of lobbying."

Article 180. That "if any paid or employed agent, representative or attorney of any person, association or corporation, shall at any place in this state, after the election and during the term of office of any member of the Legislature of this state, privately solicit the vote, or privately endeavor to exercise any influence, or offer anything of value or any other inducements whatever, to any such member of the Legislature, to influence his action concerning any measure then pending or thereafter to be introduced in either branch of the Legislature of this state, he shall be deemed guilty of lobbying."

Article 181: "The provisions of this law shall not apply to the Governor or a member of the Legislature of this state, nor prohibit any person either in person, or by his agent or attorney, or any corporation by representatives, agents or attorneys from exercising the rights of petition to the Legislature, or from collecting facts, preparing petitions, procuring evidence and submitting the same, together with arguments, to either branch of the Legislature, when in session, or to any committee thereof, in the interest of any measure in which he or it may be interested; but in such case the agency and the interest in the measure or the person so appearing shall be fully disclosed."

Article 183: "No person employed in any manner to represent the interest in legislation of any person, association or corporation shall go upon the floor of either house of the Legislature, reserved for members thereof, while in session, except upon invitation of such house. Any person violating the provisions of this Article shall be fined not to exceed one hundred dollars."

The above articles include the enactments of our Legislature on the question of lobbying passed at the Regular Session 1907, save and except the section providing a penalty and the one declaring an emergency.

It can readily be seen from a reading of these articles that the Legislature had in mind the prevention of activity by professional lobbyists. For years there has been considerable discussion and criticism of the activities of paid lobbyists in both the Legislatures of the different states of the country as well as in Congress itself, and practically every state in the Union has enacted statutes for the purpose of preventing the abuses arising from the practice employed by a certain part of the citizens in sending to each session of the different Legislatures and Congress paid representatives to influence the passage of favorable, or the defeat of unfavorable, legislation. Evidently the Legislature of this state in 1907 realized the harm resulting from such a system and, in order to prevent its continuance, passed the articles above quoted, and at the conclusion of the chapter included the following provision:

"Sec. 6. The fact that there is no law in this state defining or punishing lobbying in this state, creates an emergency, and a public necessity exists requiring that this act take effect and be in force from and after its passage, and it is so enacted." Acts 1907, c. 79.

The above section reflects that a condition prevailed in this state which our Legislature deemed to be pernicious to the welfare of the state and required immediate action on its part. Let us now look to the provisions to see, if we can, just what evil the Legislature had in mind when the action was taken.

The first article applies to persons having a direct interest in legislation, and prohibits such person from privately attempting to influence the action of a legislator in any manner other than by appealing to his reason. The following article applies to paid agents, representatives and attorneys, and prevents such persons from privately soliciting the vote of a legislator, privately endeavoring to exercise any influence over him, or offering anything of value or other inducement to

influence his action on any measure. The following article of the act excepts from its provisions the Governor or any member of the Legislature, and provides that it shall not prohibit any person or corporation or their representatives from petitioning the Legislature, collecting facts, preparing petitions, or procuring evidence and submitting same, together with arguments, to the Legislature, when in session, or to any of its committees.

It seems plain to us that the purpose of the act was to limit the activities of paid representatives to petitioning the Legislature as a whole, collecting facts, procuring evidence, and presenting same, together with arguments, to either branch of the Legislature, when in session, or to the committees, and to curb their activities in appealing to individual members. Bearing in mind the purpose of the Legislature, does the contract here sued on come within the prohibitions of the act?

In the letter from Davis to Bullard we find Davis agreeing to "aid Bullard in presenting this matter to members of the Legislature by appearing before the proper committees and interviewing individual members as may appear proper and necessary." Under article 180, a paid representative is prohibited from privately soliciting the vote of members by any means, and we think appellee brought himself clearly within the prohibitions of the statute by the very agreement upon which he is seeking to recover.

There is no claim that appellee was particularly versed in the subject contained in the proposed legislation, and, as far as the record discloses, the only reason appellant had for wanting him to go to Austin was by reason of the fact that he had served for years in the Legislature and had a personal acquaintance with practically all its members. Neither is there any claim that appellee had any interest in the measure, other than the fee which he was to receive for his services. It is our opinion that the contract alleged violates at least the spirit of the statute, if not its letter.

In 6 R. C. L. p. 733, § 138, we find the following in a discussion of contracts to further or prevent legislation: "The distinction between valid and invalid contracts to further legislation appears to be that in the former the services or the result thereof are used, or designed to be used, either before the Legislature itself or some committee thereof as a body, while in the latter a person is employed to exert his personal influence, whether great or little, with individual members, or to labor privately in any form with them, out of the legislative halls, in favor of or against any act or subject of legislation. There are, it is true, a few cases holding that personal solicitation of the members of a Legislature in behalf of a pending bill does not render the contract of employment invalid when no deception has been practiced, but these cases are so opposed to the great weight of authority that they cannot be considered as changing the general rule, that personal influence exerted over the individual members of a Legislature will vitiate a contract the consideration of which is the procurement of legislative action. As already stated, public policy requires that such a contract should be held void though there is no actual corruption in the particular case. Notwithstanding the fact that the contract does not expressly provide for personal solicitation, it will be declared illegal if it appears that in carrying out the contract it is necessary to resort to 'lobbying.' It is enough that such is the tendency of the contract."

In 9 Cyc. p. 481, we find this expression: "It is not easy to give a precise definition of public policy. It is perhaps correct to say that public policy is that principle of law which holds that no person can lawfully do that which has a tendency to be injurious to the public or against the public good, which may be designated, as it sometimes has been, the policy of the law or public policy in relation to the administration of the law. Where a contract belongs to this class it will be declared void, although in the particular instance no injury to the public may have resulted. In other words, its validity is determined by its general tendency at the time it is made, and, if this is opposed to the interests of the public, it will be invalid, even though the intent of the parties was good and no injury to the public would result in the particular case. The test is the evil tendency of the contract, and not its actual injury to the public in a particular case."

In Williston on Contracts, vol. 3, § 1727, the author thus states the rule as to such contracts: "An agreement by a legislator to exercise his judgment in a particular way is not binding at law. His promise, if without consideration, is not binding for that reason, and if he bargains for consideration it is illegal. A contract with one who is not a legislator, to induce legislators to vote in a particular way, is open to similar objections if the methods of inducing legislative action are improper. It has been said by the Supreme Court of the United States in regard to the presentation to Congress of a claim against the United States: 'We entertain no doubt that in such cases as under all other circumstances, an agreement express or implied for purely professional services is valid. Within this category are included, drafting the petition to set forth the claim, attending to the taking of testimony, collecting facts, preparing arguments, and submitting them, orally or in writing, to a committee or other proper authority, and other services of like character. All these things are intended to reach only the reason of those sought to be influenced. They rest on the same principle of ethics as professional services rendered in a

court of justice, and are no more exceptionable.' On the other hand, personal solicitation of individual members is a method which cannot be made the subject of contract."

While the facts in the case of Graves & Houtchens v. Diamond Hill Independent School District (Tex. Civ. App.) 243 S. W. 638, are not the same as the case at bar, yet we think the reasoning of Chief Justice Conner applies here, and is authority for holding the contract here sued on to be contrary to public policy and unenforceable. Legislators are chosen for the purpose of enacting only such legislation as will be beneficial to the people as a whole, and should be left free to discharge that duty without the interference, at least in private, of the paid agents of those who might for reasons peculiar to themselves either oppose or favor the enactment of a particular measure.

The subjection of the legislator to importunity by such parties may result in his being misinformed or at least in having a bias or prejudice aroused in his mind for or against the measure which is detrimental to the public weal. We do not want to be understood as holding, or even suggesting, that the parties to this contract contemplated the use of corrupt means by appellee, yet we do hold that the contract is one which had a tendency to be injurious to the public and called for the doing of things prohibited by our statutes. If we are correct in this holding, then the general demurrer of the appellant should have been sustained by the trial court, and the judgment rendered in this cause should be reversed.

Ordinarily, when the judgment of a trial court overruling a general demurrer to a petition is reversed, the appellate court should not render a judgment in favor of appellant because the plaintiff in such case, by an erroneous ruling of the trial court, should not be deprived of his right to amend his petition. This rule, however, should not be followed when it appears, as in this case, that it is not possible to so amend as to state a cause of action.

In accordance with the holdings in the authorities above cited, and our views on the questions discussed, the judgment of the court below is reversed, and judgment here rendered for appellant.

Reversed and rendered.