## DAVIS v. TEXAS FARM BUREAU COTTON ASS'N.

### No. 1177—5501.

Commission of Appeals of Texas, Section B.
June 24, 1933.

John Davis and Davis & Hatchell, all of Dallas, for plaintiff in error.

C. K. Bullard, Holland, Bartlett, Thornton & Chilton, and George C. Purl, all of Dallas, for defendant in error.

RYAN, Judge.

Plaintiff in error sued defendant in error to recover a balance claimed to be due upon a contract of employment made with him by C. K. Bullard, Esq., its attorney, in its behalf, for services as an attorney to aid Mr. Bullard with a bill the association desired to have enacted by the Legislature, then in session.

The trial court peremptorily instructed a verdict for plaintiff and rendered judgment accordingly. The Court of Civil Appeals held the contract as pleaded to be a violation of the Lobbying Statute (article 179 et seq. of the Penal Code of 1925) and reversed the judgment below. It also held that it was not possible to so amend the petition as to state a cause of action that a general demurrer thereto should have been sustained, and therefore rendered judgment for the defendant in error. 16 S.W.(2d) 544, 548.

It appears that on Saturday January 22, 1927, Mr. Bullard interviewed plaintiff in error, in Dallas, Tex., with a view to procuring the latter's services, as a result of which Mr. Davis on the same day, by letter to Mr. Bullard, advised him that he would be prepared to leave Sunday night and be in Austin Monday morning, and assist in presenting the matter to members of the Legislature by appearing before the proper committees and interviewing individual members as may appear proper and necessary.

In this connection, plaintiff in error testified as follows:

"From January 1st, 1919, until December 31st, 1922, I was a member of the House at Austin; from January 1st, 1923, to Dec. 31st, 1926, I was Senator from Dallas District, all the official positions I have held outside of Notary Public. While I was a member of the House of Representatives I was on a number of committees during the time that I served. For the four years I was in the Senate I was on several committees in the Senate. As a member of the House I represented Dallas County. By virtue of my occupying the committees, as a committeeman in the House and in the Senate, I became conversant with the rules and regulations governing the procedure of those two houses.

"I know Mr. C. K. Bullard; I suppose I have known him since he has been here, certainly more than four or five years. In January 1927, Mr. C. K. Bullard was attorney for the Texas Farm Bureau Cotton Association. On January 23rd, 1927, I had a conversation with Mr. Bullard over the telephone. Mr. Bullard called me over the tele-

phone and I recognized his voice; he stated who he was, that he was C. K. Bullard and advised me that the Texas Farm Bureau Cotton Association was interested in some bills pending before the Legislature. Of course I couldn't tell the exact words we used or said in every respect. I can remember the substance and that is what I am giving. To the best of my memory Mr. Bullard called me up and said, 'The Texas Farm Bureau Cotton Association is interested in some bills or bill pending before the Legislature and would like for you to go down and aid us in presenting the matter to the Legislature.' I replied by saying that I would be pleased to go under proper conditions; he said, 'What would be your fee for going?' And I replied, 'My fee, well, how much time would it require and when do you want me to go?', and he said, 'I want you to leave here Sunday afternoon and be there two days anyway, Monday and Tuesday.' And I said, 'Well, for two days that you want me to go down there, I will go for $500.00 and expenses.' The conversation perhaps terminated with this suggestion, that they would send me down my fee.

"During that conversation Mr. Bullard talked to some other parties where he was at the other end of the line; my memory is, I understood and heard that he was talking to Mr. Williams who is Secretary-Treasurer of the Texas Farm Bureau Cotton Association. Immediately after concluding this conversation I sent the following letter to Mr. Bullard, viz:

" 'Dallas, Texas, January 22, 1927.

" 'Mr. C. K. Bullard, Attorney, Texas Farm Bureau Cotton Association, Dallas, Texas.

" 'Dear Sir: Further referring to the matter of my services as attorney for the Texas Farm Bureau Cotton Association to aid you with a bill you desire to have enacted by the Legislature of Texas, beg to advise you that I shall be pleased to leave Dallas Sunday night, and that I shall be in Austin Monday morning and aid you in presenting this matter to members of the Legislature by appearing before the proper committees and interviewing individual members as may appear proper and necessary.

" 'Please let me have your check or voucher for $50.00 to apply to my expenses as well as an additional check or voucher for $500.00 for my fee for services in this connection. This will be in full of my fee and expenses, in the event I conclude my work by Tuesday evening. If I am required to remain longer or to return to Austin at a later day, I shall make additional charges on the same basis as here stated.

" 'Very truly yours,

" 'John Davis.'

"After sending my letter on the afternoon of Saturday, January 22nd, I think about

four o'clock that same afternoon I received the following reply from Mr. Bullard:

"'Law Offices C. K. Bullard
"'1601-2 Magnolia Building,
"'Dallas, Texas.
"'Counsel for Farm Bureaus and Co-Operative Marketing Associations.

"'January 22, 1927.

"'Hon. John Davis, Dallas, Texas.

"'Dear Mr. Davis: Enclosed please find, copy of bill being sponsored by Texas Farm Bureau Cotton Association in the Legislature, which I desire you to assist me in its passage.

"'I have just received your letter of this date regarding the fee arrangement which is agreeable. I will have the Association issue you a check for the $500.00 fee, and on your return you can furnish me with statement of your expenses, and I will see that same is paid. I presume this will be more agreeable than the plan you suggest, since I do not know just how many days it will take.

"'I will take the Sunday noon train, or Sunday night train (Katy) for Austin, and should I miss you on the train, I will meet you at Stephen F. Austin Hotel Monday morning at 8:30.

"'Very truly yours,

"'CKB:VLS C. K. Bullard.'"

It is claimed by plaintiff in error that said two letters, which he incorporated in his petition, constituted the contract between the parties.

The petition alleged, among other things: "That said bills were Senate Bill No. 156 and House Bill 163. That this plaintiff did from time to time see that said bills were brought up before the proper committees and did, without exerting, and without any intent of exerting, or seeking to exert any personal influence over said committees, or any of the members thereof, appear before said committees from time to time and discuss with them the merit of said bills, and at the request of such committees, give to them such data, figures and information as they desired, and in a proper and legitimate manner urged favorable reports thereon, and a few times openly discussed the merit of said bills with individual members of the Senate and House and in a perfectly discreet, proper and legitimate manner gave them such information as they desired to enable them to determine whether or not said bills were or were not meritorious, and from time to time advised the defendants and each of them of the progress of such bills and from day to day looked after the condition of said bills on the records of the House and of the Senate and complied in all respects, in a proper, reasonable and legitimate way, with said contract between the plaintiff and the defendants," and admits

payment of the $500 referred to, and $255 representing his expenses in connection with the matter.

The suit sought a recovery at the rate of $250 per day for a period of twelve days additional spent by Mr. Davis in Austin on said matter.

The association excepted generally and specially to plaintiff's petition, pleaded general denial, and specially denied making the contract sued upon, evidenced by plaintiff's letter to Mr. Bullard and Mr. Bullard's letter to him, both written on January 22, 1927. The association's answer does admit making an oral contract with plaintiff, Davis, on or about that date, employing him to go to Austin with Bullard, its attorney, and assist it in securing the passage of the two bills, one of which, House Bill No. 163, had already been introduced, and the other, Senate Bill No. 156, was at that time in the hands of a Senator for introduction in the Senate; in consideration of such assistance in securing the passage of said bills by appearing before the proper legislative committee and by personally interviewing the members of the Legislature and securing their co-operation in the passing of said bills, Mr. Davis was to receive a fee of $500 and all reasonable and necessary expenses, all of which has been paid.

The association's answer then charges that the contract contemplated that plaintiff would privately solicit votes of individual members of the Legislature and privately endeavor to exercise influence upon them for the purpose of securing passage of said bills, in violation of article 180 of the Penal Code of the state of Texas, known as the "Lobbying Statute."

Said answer further denies that the above letters from Davis to Bullard and from Bullard to Davis constitute any contract binding on it, or was so intended, or that the previous oral contract should be reduced to writing, or that said letters should be substituted as a written contract in lieu thereof.

Senator Davis testified that he left for Austin on Sunday afternoon and met Mr. Bullard and Mr. John T. Orr, president of the association, at Austin on Monday morning before the Legislature convened. A meeting of the Committee on Agriculture of the House was arranged to consider House Bill No. 163; the bill was explained by Senator Davis, Mr. Orr, and Mr. Bullard. Considerable opposition to the bill developed in the Committee but a majority voted favorably and it was so reported to the House; this was on Monday January 24, 1927. On the same day another bill was introduced in the Senate as Bill No. 156 and referred to the Senate Committee on Agriculture, before whom a hearing was had.

Senator Davis testified also: "Mr. Bullard and myself were there and the Senate Committee gave us a rather extended hearing. We appeared there before the Committee just like we did in the House and presented our argument and there was considerable opposition developed to the bill as presented, especially two Senators were there who were opposed to it; they said however that they would support the bill if amendments would be put on the bill. They suggested the nature and extent of those amendments and Mr. Bullard and myself undertook to, and did, prepare several amendments trying to conform to the views of the Senators who objected, and at the same time, preserve the bill as we thought it should be preserved. Those amendments were finally acted upon by the Committee as stated and reported that the bill do pass with such amendments. That was all done during the first week we were down there. * * * I went back the second week and I followed this bill up through the different steps that I have detailed through the second week, in the Senate and in the House; I followed each step from day to day and from hour to hour while I was there. I was there the second week, Monday morning, January 31st, and remained there until Friday in the afternoon, or night of February 4th, 1927, five days the second week. * * * At the end of the second week's work I had a conversation with Mr. C. K. Bullard over the telephone. I called Mr. Bullard up and I said, 'Mr. Bullard, you have heretofore sent me $500.00. I have used a pretty good part of that $500.00 on expenses, and I wish you would send me an extra $500.00 or $1,000.00 on account.' Mr. Bullard replied by saying that the officers of the Company, or the employees, who had that matter in hand, of issuing checks, had either gone from the office or left the City and that he would see about it Monday morning; see that I got the check for some of it, without stating the amount, on Monday morning. I did not get the check. At the time of this conversation I had put in nine days at Austin. For the nine days he would have owed me $2,250.00, less $500.00 that had been paid, making $1,750.00. I don't remember the exact amount I did ask for him to send me a check for on account. Nothing was said in that conversation as to whether he owed me any more fee or not."

Mr. Sapiro, general counsel for the association, was not satisfied with the bill as amended and telegraphed Mr. Bullard that it would destroy the purpose of the original bill and advised that the bill be withdrawn completely unless it could be passed without the amendments; in reply, Senator Davis wrote Mr. Bullard outlining his views with reference to the amendments as well as to his work and conferences with members of the Legislature, which letter he offered in evidence.

In this letter Senator Davis stated: "From interviews had by the writer with several members of the House he is of the opinion that the House will refuse to adopt the committee amendments striking out the Bowers' amendment, but that the House will finally pass the Senate Bill as amended by the Bowers' amendment and that perhaps no other amendments will be offered or adopted if we do not have our friends on the floor of the House undertake to strike out the Bowers' amendment. On the other hand, if we, through our friends, undertake to strike out the Bowers' amendment, then it is more than likely that the bill will be amended otherwise by some one or more members of the House."

On cross-examination he testified: "I was personally acquainted with many of the members of the Senate and House before I went to Austin, some of the men with whom I served in the Senate were still members of the Senate. My memory is, off-hand, that there were six new members, that is, members who were not members when I was a member of the Senate. There are thirty-one members of the Senate; all but six served with me and there was one woman in that six, five men and one woman. I imagine that I knew at least half of the members of the House of Representatives, not including the Dallas delegation. I had served four years in the House. I had served in the House with some who were subsequently elected to the Senate, and as I recall, there were two or three, or maybe more that that, that were serving in the Senate during the time.

"The House has one hundred and fifty members unless some of them had died or resigned, and at that time I don't recall that any had.

"Mr. Bullard called me on the phone; I understood from his conversation that the bill had not been introduced in one of the houses, either the House of Representative, or the Senate, at that time. He told me that he had a copy of the bill that had been introduced; I don't recall any comments of whether or not it was satisfactory to anybody or not, he told me of the facts, that the bill had been prepared and he would send the copy down. There was nothing in that conversation over the telephone about me drawing the bill, and there was nothing in that conversation over the telephone about me drawing any amendments to the bill. I understood by that conversation that they wanted me to do legal work, any kind of legal work necessary to promote the passage of the bill; the preparation of the argument and arguing before the committees is what I understood they wanted done, and seeing

94

that the bill was passed from step to step in due order. * * * I don't recall that Mr. Bullard said to me in that conversation that there was considerable opposition to the bill; I wrote that letter within ten minutes after I talked to him, and the conversation was substantially repeated in that letter. I don't recall that he said anything about the Association being in difficulties down there with this bill and that there was considerable opposition, he may have said something of that kind; he thought, he said, that I could be of considerable aid; he didn't say that he was in any legal difficulties nor did he say at any time that there was anything legally wrong with the bill and that he needed a lawyer.

"During the three or four weeks that I was down there I guess I talked to practically every member of the House and Senate, on one occasion or another, passing by they would say, 'John, what are you down here for?' and I would tell them, and they would say 'I don't know anything about that bill, I want to see you a little later so you can tell me.' And in the next few days if I would have time they would come and sit down by me or stop and chat a little bit. Most of them called me 'John'. They merely wanted to know what the bill was and what it was all about and I told them in substance, some said they were for it and some said they were against it. The only time I ever sought and obtained a hearing by or before anybody in connection with this bill on my own motion was when I appeared before the Committee. I never approached any member of the Association myself or the Legislature, I should say, in behalf of this bill except before the Committees, only in this way, that when they wanted to know something I would tell them. I might have met them on the floor or in the lobby of the building and had a word, but at no time did I seek or privately solicit anybody to vote for the bill; I never did that when I was a member of the Legislature and neither did I do it afterwards. I always presented my bill on its merits and stand or fall on the merits of the cause, and my record will show that at Austin. * * * I was present in the Senate when the bill was considered on the floor. * * * I did not solicit Senator Bowers' vote; I did not talk privately to Mr. McCombs nor to anybody privately about this bill. I talked to Senator Bowers and Senator Lewis but not privately; I did talk to them individually, several times on the floor of the Senate and several times perhaps in the Committee Room. We were talking about the thing, the extent of these proposed amendments; we were trying to get an agreement on the amendment that they wanted. They said they would not support the bill unless the amendments were a part of the bill. We discussed the amendment and tried to get an agreement on

what the amendment should contain. They finally agreed to the amendment which you see here, largely prepared by Senator Bowers and Mr. Bullard and myself helped to work it out. Mr. Bowers said that he would vote for the bill if it had certain amendments. We worked it out in two or three days; he and Senator Lewis worked together a while and would bring something out and Bullard and myself would review it and see if we could get together with him on it. They certainly understood during that time that I was an attorney for the Cotton Association. They understood that I was appearing as an attorney and being paid a fee for it. I am pretty sure that I talked to Senator Woodward about the bill, but not privately.

"When one of those Senators came up to me and asked me what I was there for and he undertook to discuss the matter with me I did not ask him to discontinue the discussion until I could get myself in a position that I was not in private; we talked about it wherever we met but not privately; it was open, public and above board. By privately, I meant that I talked to them openly, publicly and in the presence of other people, passing and going, I didn't talk to them in a room in a hotel and didn't have any private conversation with them. * * * During the time I was down there I guess I took half a dozen of my friends to dinner with me; some of them were members of the Legislature. On those occasions we discussed the matter in connection with this measure a few times, not very many. Just off-hand I would say that I ate one or more times while I was there with Senator Bowers and Senator Lewis and perhaps Senator Woodward and Senator Fairfield and a few members of the House, I would not say which ones.

"I did not communicate to those gentlemen that I was deeply interested in the passage of this bill; they knew that I was there as a paid attorney to present the case for my client. Most of them perhaps knew that I had already presented it to the Committee, all of them, because as a Committee is in session from time to time, they probably saw me there. That occurred in the House the first week and in the Senate the first week and of course when the Senate Bill got to the House it had to go before the House Committee again.

"I don't remember whether I told them that I was receiving $250.00 a day and expenses, but if either of them had asked me I would have told them, because I did tell some of them. I don't recall whether they asked me or not. * * * I stated yesterday morning that about nine days after I had been down there that I had about exhausted my $500.00 and I wrote a letter or talked to somebody connected with the As-

sociation and advised them of the fact and asked for more money."

Mr. Bullard testified, in substance, that when the bill came up for debate on the floor, it was attacked, and he (Bullard) mentioned certain Senators to "talk to and see if he could not explain the bill to them and see if he could not stop such opposition, especially as they were friends of his and mine and I believed had a great deal of confidence in him and I wanted him to talk to these senators." According to Mr. Bullard's testimony, these Senators were seen and talked to, individually, and the result reported to him by Senator Davis, and he (Bullard) had seen Senator Davis "go in and meet some of these men and go off to one side and sit down on a seat and talk with them and I have seen him do that with different ones * * * I asked Senator Davis to talk to members of the House. * * * When I requested him to talk to any of these senators and representatives in behalf of this bill, he never failed to comply with my requests that I know of and he was glad to do it; he never failed to come back and make a report on the attitude of every man that he asked about the bill. * * * I gave Senator Davis other instructions than those I have detailed, but those I have told you, I gave; those particular ones I have given as near as I remember, I might remember more of them; I have not undertaken to give them verbatim, but the substance of the instructions that I gave pertaining to interviewing these different members. I had Senator Davis interview these members and he did it graciously and willingly and did it as I instructed, and I have no complaint to make of that at all; he worked faithfully under those instructions, the ones I have testified about."

Our "Lobbying" Statute is carried into the Penal Code of 1925 as articles 179 to 183.

The first article (179) is as follows: "Art. 179. If any person having any direct interest, or the president or any other officer of any corporation having any direct interest in any measure pending before, or thereafter to be introduced in either branch of the Legislature of this State, in any manner, except by appealing to his reason, privately attempt to influence the action of any member of such Legislature, during his term of office, concerning such measure, he shall be deemed guilty of lobbying," and applies to persons having a direct interest in legislation. It would seem that such persons might privately attempt to influence the action of members of the Legislature but only by appealing to their reason.

■ The next article (180) applies to paid agents, representatives, and attorneys and prohibits them from privately soliciting the vote of a legislator or privately endeavoring to exercise any influence over him concern-

ing any measure before the Legislature. It would seem that even an appeal to the legislator's reason, if privately made, comes under the ban of the statute, if made by a paid agent, representative, or attorney of one seeking legislative favors, who are thus differentiated from and otherwise classified than parties having a direct interest contemplated in article 179.

Said article 180 is as follows: "Art. 180. If any paid or employed agent, representative or attorney of any person, association or corporation, shall at any place in this State, after the election and during the term of office of any member of the Legislature of this State, privately solicit the vote, or privately endeavor to exercise any influence, or offer anything of value or any other inducements whatever, to any such member of the Legislature, to influence his action concerning any measure then pending or thereafter to be introduced in either branch of the Legislature of this State, he shall be deemed guilty of lobbying."

Article 181 excepts the Governor and members of the Legislature from the provisions of the act and reaffirms the constitutional right of petition to the Legislature and permits the collecting of facts and submitting the same together with arguments to either branch, when in session or to any committee thereof.

Said article is as follows: "Art. 181. The provisions of this law shall not apply to the Governor or a member of the Legislature of this State, nor prohibit any person either in person, or by his agent or attorney, or any corporation by representatives, agents or attorneys from exercising the rights of petition to the Legislature, or from collecting facts, preparing petitions, procuring evidence and submitting the same, together with arguments, to either branch of the Legislature, when in session, or to any committee thereof, in the interest of any measure in which he or it may be interested; but in such case the agency and the interest in the measure or the person so appearing shall be fully disclosed."

A penalty for violation of the law is provided in article 182, as follows: "Art. 182. Any person who shall be convicted of lobbying, shall be fined not less than two hundred nor more than two thousand dollars, and in addition may, at the discretion of the jury, be imprisoned in the penitentiary for not less than six months nor more than two years. Any violation of this law may be prosecuted in the county where the offense is committed, or in Travis County."

The act also denies to employed representatives of parties interested in legislation the right to go upon the floor of either House of the Legislature when in session, except upon invitation of such House, by article 183, as follows: "Art. 183. No person employed in any manner to represent the interest in legis-

lation of any person, association or corporation shall go upon the floor of either House of the Legislature, reserved for members thereof, while in session, except upon invitation of such House. Any person violating the provisions of this article shall be fined not to exceed one hundred dollars."

The purpose of the act, unquestionably, is to make unlawful the private solicitation of legislative votes concerning legislative action and the private endeavor to exercise influence by argument or otherwise, by paid or employed representatives of parties interested in such legislative action, and to confine their activities to the open and aboveboard presentation of facts and argument before the Legislature, either branch or any committee thereof, when in session.

Whenever any such paid or employed representative goes beyond the limitations of the statute and singles out individual legislators, privately, and either by argument or otherwise endeavors to influence their action, he transgresses the law, however fair in intent he may be.

 The distinction between valid and invalid contracts with paid or employed representatives to further legislation appears to be that in the former the services or the result thereof are used, or designed to be used, openly and publicly, either before the Legislature itself or some committee thereof as a body, while in the latter a person is employed to exert his personal influence, whether great or little, with individual members, or to labor privately in any form with them, out of the legislative halls, in favor of or against any act or subject of legislation. Personal influence exerted over the individual members of a Legislature will vitiate a contract, the consideration of which is the procurement of legislative action. Such a contract should be held void though there is no actual corruption in the particular case. Although the contract may not expressly provide for personal solicitation it will be declared illegal if it appears that in carrying out the contract it is necessary to resort to "lobbying"; it is enough that such is the tendency of the contract. 6 R. C. L. 733.

This doctrine is illustrated in Galveston County v. Gresham (Tex. Civ. App.) 220 S. W. 560, and Graves & Houtchens v. Diamond Hill Independent School District (Tex. Civ. App.) 243 S. W. 638.

In the Gresham Case the attorney's employment was to go before the proper committee or committees of Congress in the matter of the extension of the sea wall around the city of Galveston, and the evidence showed that he did not go further than to appear before the proper committee of Congress and did not interview or solicit the vote or influence of any member of Congress. The court held that the employment was not a "lobbying" contract and Gresham was entitled to recover.

On the other hand, in the Graves & Houtchens Case, the contract consisted of the undertaking to defeat, if possible, certain proposed legislation, to accomplish which the attorneys wrote numerous letters and addressed them to the members of the Legislature, and "on account of the fact that the senators had gained knowledge, and did thereafter come into possession of knowledge through the plaintiffs' efforts and influence, and through the efforts and influence of those under plaintiffs' direction and instruction, said senators lost all interest in said bill, and permitted the same to die upon the calendar. * * * These plaintiffs further say that, had it not been for their influence and efforts * * * said representatives and senators would have voted favorably in each instance upon said bill, and the same would have become a law."

The court held: "The plaintiffs' petition in this case, as we construe it, substantially brings it within the spirit, at least, of the article. The obvious and avowed purpose of the agreement was to prevent the passage of a bill pending before the Legislature, regardless of the effect that it would have upon the general public. The language of the petition shows that the inducement existed to exert every effort at the command of counsel to use improper influences if necessary to accomplish their avowed object. The language of the petition is 'to accomplish the defeat, if possible, of a certain proposed legislative bill.' The fee claimed was not insignificant, and, however honest and sincere the plaintiffs may have been—and their honesty and sincerity is not questioned in this case—the temptation existed to exercise improper influences upon individual legislators, and the policy of law generally is to preclude such a possibility."

The doctrine of our Texas courts is in entire accord with the authorities generally throughout the country, elucidated (3 Williston on Contracts, art. 1727) thus: "It has been said by the Supreme Court of the United States, in regard to the presentation to Congress of a claim against the United States: 'We entertain no doubt that in such cases, as under all other circumstances, an agreement express or implied for purely professional services is valid. Within this category are included drafting the petition to set forth the claim, attending to the taking of testimony, collecting facts, preparing arguments, and submitting them, orally or in writing, to a committee or other proper authority, and other services of like character. All these things are intended to reach only the reason of those sought to be influenced. They rest on the same principle of ethics as professional services rendered in a court of justice, and are no more exceptionable.' On

the other hand, personal solicitation of individual members is a method which cannot be made the subject of contract."

The principle is thus epitomized: "The law also seeks to cast its protection around legislative sessions, and to shield them against corrupt and improper influences, by making void all contracts which have for their object to influence legislation in any other manner than by such open and public presentation of facts, arguments, and appeals to reason as are recognized as proper and legitimate with all public bodies. While counsel may be properly employed to present the reasons in favor of any public measure to the body authorized to pass upon it, or to any of its committees empowered to collect facts and hear arguments, and parties interested may lawfully contract to pay for this service, yet to secretly approach the members of such a body with a view to influence their action at a time and in a manner that do not allow the presentation of opposite views, is improper and unfair to the opposing interest; and a contract to pay for this irregular and improper service would not be enforced by the law." 1 Cooley's Constitutional Limitations (8th Ed.) p. 280; 29 A. L. R. 158.

We quote from the annotation 29 A. L. R. 159: "And it has been held that if a contract the consideration for which is based upon the procurement of legislative action implies or contemplates that the services to be rendered are to be in the nature of lobbying, the contract is void regardless of whether corruption was actually resorted to, the decisions being on the ground that the evil tendency of the contract is sufficient to vitiate it. Hazelton v. Sheckels (1906) 202 U. S. 71, 50 L. Ed. 939, 26 S. Ct. 567, 6 Ann. Cas. 217, Hayward v. Nordberg Mfg. Co. (1898) 29 C. C. A. 438, 54 U. S. App. 639, 85 F. 4; Sussman v. Porter ([C. C.] 1905) 137 F. 161; Weed v. Black (1875) 2 MacArth. ([9] D. C.) 268, 29 Am. Rep. 618; Owens v. Wilkinson (1902) 20 App. D. C. 51; Mills v. Mills (1869) 40 N. Y. 546, 100 Am. Dec. 535; Clippinger v. Hepbaugh (1843) 5 Watts & S. (Pa.) 315, 40 Am. Dec. 519, infra, II.; Powers v. Skinner (1861) 34 Vt. 274, 80 Am. Dec. 677."

And from pages 173 and 174 of the same annotation, 29 A. L. R.: "But while compensation may be recovered for purely professional services stipulated in a contract looking to future legislation, if the contract for professional services is blended and confused with stipulations for lobbying services of the kind forbidden, the entire contract is void, and no recovery can be had for any part of the services rendered thereunder. Trist v. Child [21 Wall. 441, 22 L. Ed. 623] (U. S.) supra; Hazelton v. Sheckels (1906) 202 U. S. 71, 50 L. Ed. 939, 26 S. Ct. 567, 6 Ann. Cas. 217; Guerra v. Conde (1907) 4 Porto Rico Fed. Rep.

54; Globe Works v. United States (1910) 45 Ct. Cl. (Fed.) 497."

The statute enacted into law the above principles and provides a penalty for the violation thereof.

We agree with the Court of Civil Appeals in the statement that:

"Legislators are chosen for the purpose of enacting only such legislation as will be beneficial to the people as a whole, and should be left free to discharge that duty without the interference, at least in private, of the paid agents of those who might for reasons peculiar to themselves either oppose or favor the enactment of a particular measure.

"The subjection of the legislator to importunity by such parties may result in his being misinformed or at least in having a bias or prejudice aroused in his mind for or against the measure which is detrimental to the public weal. We do not want to be understood as holding, or even suggesting, that the parties to this contract contemplated the use of corrupt means by appellee, yet we do hold that the contract is one which had a tendency to be injurious to the public and called for the doing of things prohibited by our statutes" —and also in its disposition of the case and therefore recommend that the judgment of the Court of Civil Appeals be affirmed.

CURETON, Chief Justice.

The judgment of the Court of Civil Appeals is affirmed, as recommended by the Commission of Appeals.